Nos. 14-3013 & 14-3105

———————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

v.

SINOVEL WIND GROUP CO., LTD.,
*Defendant-Appellant*

———————————————————

IN RE SINOVEL WIND GROUP CO., LTD.,
*Petitioner*

———————————————————

**APPELLANT'S BRIEF, SHORT APPENDIX, AND MOTION IN THE
ALTERNATIVE TO CERTIFY QUESTION OF STATE LAW**

———————————————————

On Appeal from and Petition for Writ of Mandamus to the
United States District Court for the Western District of Wisconsin

No. 3:13-cr-84-bbc
The Honorable Barbara B. Crabb

———————————————————

Matthew J. Jacobs
VINSON & ELKINS LLP
525 Market St., Suite 2750
San Francisco, CA 94105
(415) 979-6900
mjacobs@velaw.com

Travis R. Wimberly
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, TX 78746-7568
(512) 542-8524
twimberly@velaw.com

John P. Elwood*
    *Counsel of Record*
Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
(202) 639-6518
jelwood@velaw.com

*Counsel for Appellant Sinovel Wind Group Co., Ltd.*

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>14-3013 & 14-3105 [consolidated]</u>

Short Caption: <u>U.S. v. Sinovel Wind Group Co. Ltd.; Sinovel Wind Group Co. Ltd. v. Barbara Crabb</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Sinovel Wind Group Co. Ltd.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Vinson & Elkins LLP

Fitzgerald Law Firm, SC

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Dalian Heavy Industries Crane Group Co. Ltd. (incorporated in the People's Republic of China)

Attorney's Signature: <u>*s/ John P. Elwood*</u>    Date: <u>12-17-14</u>

Attorney's Printed Name: <u>John P. Elwood</u>

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes <u>X</u>    No

Address: <u>2200 Pennsylvania Ave NW</u>

<u>Suite 500 West</u>

Phone Number: <u>202-639-6518</u>    Fax Number: <u>202-879-8917</u>

E-Mail Address: <u>jelwood@velaw.com</u>

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ......................................................................... i

TABLE OF CONTENTS.............................................................................. ii

TABLE OF AUTHORITIES ........................................................................ iv

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES........................................................................... 3

STATEMENT OF THE CASE...................................................................... 4

I.    Legal Background ......................................................................... 4

    A.    Historically, the civil and criminal rules imposed territorial limitations on service of process ............................................ 5

    B.    Criminal Rule 4 contains mandatory requirements for serving an organization.................................................................. 6

    C.    Since 2012, the Department of Justice has been working to amend Criminal Rule 4 to allow service abroad ................... 7

II.   Factual Background ...................................................................... 8

    A.    A civil contract dispute arises between Sinovel and AMSC.................. 8

    B.    AMSC successfully lobbies for this criminal prosecution ...................... 9

    C.    The government tries to serve Sinovel through a U.S. subsidiary ...... 11

    D.    The government invokes a novel "alter-ego" theory of service ............ 12

    E.    The District Court adopts the government's alter-ego theory............. 12

STANDARD OF REVIEW .......................................................................... 14

SUMMARY OF ARGUMENT ..................................................................... 15

ARGUMENT .......................................................................................... 18

I.    This Court Has Collateral-Order Jurisdiction To Hear This Appeal ............ 18

    A.    The order conclusively determines the issue of service ....................... 18

    B.    The service question is separate from the merits ................................. 19

    C.    The service question is not practically reviewable on appeal from final judgment ........................................................... 20

    D.    Mandamus is an alternate basis for jurisdiction ................................. 25

II.   The District Court's Alter-Ego Theory Is Inconsistent With Rule 4.............. 25

A.    The government did not comply with Rule 4's two explicit requirements for service of process ........................................ 25

B.    The Rule's context and drafting history confirm its mandatory nature.................................................................................... 27

C.    The civil alter-ego doctrine does not excuse non-compliance with the Rule................................................................................ 33

III.    The District Court Misapplied Controlling Delaware Law ............................ 38

A.    Delaware law requires fraud or similar injustice to pierce the corporate veil, even in "jurisdictional" cases.......................................... 39

B.    The District Court erroneously relied on dicta from one trial-court decision.......................................................................... 42

C.    The government has not shown, or even alleged, that Sinovel used the corporate form to perpetrate fraud or injustice .................... 45

D.    Alternatively, this Court could certify the veil-piercing question to the Delaware Supreme Court .............................................. 45

IV.    The District Court Clearly Erred By Piercing the Corporate Veil Based On Facts Common To Ordinary Parent-Subsidiary Relationships ................ 46

A.    The record shows an unremarkable parent-subsidiary relationship and observation of corporate formalities.......................... 47

B.    The facts cited by the District Court do not prove otherwise .............. 49

C.    The District Court did not address the government's failure even to attempt diplomatic service.................................................. 51

CONCLUSION.......................................................................... 53

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32............................... 54

CERTIFICATE OF SERVICE............................................................ 55

CERTIFICATE OF COMPLIANCE WITH CIR. R. 30(d) ......................................... 56

APPENDIX TABLE OF CONTENTS ....................................................... 57

## <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                              **Page(s)**

*Abelesz v. Magyar Nemzeti Bank,*
   692 F.3d 661 (7th Cir. 2012) ................................................................................ 20

*Abelesz v. OTP Bank,*
   692 F.3d 638 (7th Cir. 2012) ......................................................................... 18, 25

*Abney v. United States,*
   431 U.S. 651 (1977) ............................................................... 2, 18, 19, 21

*Akzona, Inc. v. E.I. Du Pont De Nemours and Co.,*
   607 F. Supp. 227 (D. Del. 1984) ...................................................................... 49

*Ali v. Beechcraft Corp.,*
   C.A. No. N11C–12–253 FSS, 2014 WL 3706619 (Del. Super. Ct. June 30,
   2014) ................................................................................................................ 43

*Applied Biosystems, Inc. v. Cruachem, Ltd.,*
   772 F. Supp. 1458 (D. Del. 1991) .................................................................... 42

*Aprahamian v. HBO & Co.,*
   531 A.2d 1204 (Del. Ch. 1987) ....................................................................... 39

*Bates v. United States,*
   522 U.S. 23 (1997) .......................................................................................... 29

*Bhole, Inc. v. Shore Investments, Inc.,*
   67 A.3d 444 (Del. 2013) .................................................................................. 43

*Cannon Mfg. Co. v. Cudahy Packing Co.,*
   267 U.S. 333 (1925) .................................................................................. 26, 34

*Case Financial, Inc. v. Alden,*
   No. 1184-VCP, 2009 WL 2581873 (Del. Ch. Aug. 21, 2009) .................................. 39

*Cent. Virginia Cmty. Coll. v. Katz,*
   546 U.S. 356 (2006) ........................................................................................ 44

*Chaplake Holdings, Ltd. v. Chrysler Corp.,*
   Civ. A. No. 94C-04-164, 1995 WL 653510 (Del. Super. Ct. Aug. 11, 1995)............ 42

*Cohen v. Beneficial Indus. Loan Corp.,*
   337 U.S. 541 (1949) .................................................................................. 18, 22

*Craig v. FedEx Ground Package Sys., Inc.,*
   686 F.3d 423 (7th Cir. 2012) ...................................................................... 45, 46

*Crosse v. BCBSD, Inc.,*
   836 A.2d 492 (Del. 2003) ................................................................................ 39

*Doe v. Unocal Corp.,*
   248 F.3d 915 (9th Cir. 2001) ........................................................................... 49

**Cases—Continued:**                                                        **Page(s)**

*Dole Food Co. v. Patrickson,*
    538 U.S. 468 (2003) .................................................................... 17

*Eberhart v. United States,*
    546 U.S. 12 (2005) ..................................................................... 27

*EBG Holdings LLC v. Vredezicht's Gravenhage 109 BV,*
    Civ. A. No. 3184-VCP, 2008 WL 4057745 (Del. Ch. Sept. 2, 2008) ...................... 41

*EEOC v. Arabian Am. Oil Co.,*
    499 U.S. 244 (1991) .............................................................. 23, 24

*Ex Parte Republic of Peru,*
    318 U.S. 578 (1943) .............................................................. 22, 37

*Familia De Boom v. Arosa Mercantil, S.A.,*
    629 F.2d 1134 (5th Cir. 1980) ....................................................... 47

*Fink v. Igoe,*
    279 F.2d 544 (7th Cir. 1960) ........................................................ 27

*Fitzgerald v. Cantor,*
    No. C.A. 16297-NC, 1998 WL 842316 (Del. Ch. Nov. 10, 1998) .......................... 41

*Flanagan v. United States,*
    465 U.S. 259 (1984) .............................................................. 2, 20

*Fletcher v. Atex, Inc.,*
    68 F.3d 1451 (2d Cir. 1995) ......................................................... 49

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ................................................................. 21

*Greene v. Holloway,*
    210 F.3d 361 (4th Cir. 2000) ........................................................ 15

*Henderson v. United States,*
    517 U.S. 654 (1996) ................................................................. 34

*Hertz Corp. v. Friend,*
    559 U.S. 77 (2010) .................................................................. 27

*HMG/Courtland Prop., Inc. v. Gray,*
    729 A.2d 300 (Del. Ch. 1999) ........................................................ 40

*In re Auto. Refinishing Paint Antitrust Litig.,*
    358 F.3d 288 (3d Cir. 2004) ......................................................... 29

*In re Hijazi,*
    589 F.3d 401 (7th Cir. 2009) .................................................. 23, 37, 52

*In re Pet'n of Boehringer Ingelheim Pharm., Inc.,*
    745 F.3d 216 (7th Cir. 2014) ........................................................ 38

**Cases—Continued:** Page(s)

*Int'l Shoe Co. v. Washington,*
326 U.S. 310 (1945) ................................................................ 33

*Joiner v. Ryder Sys. Inc.,*
966 F. Supp. 1478 (C.D. Ill. 1996) ......................................... 49

*Lawshe v. Simpson,*
16 F.3d 1475 (7th Cir. 1994) .................................................. 15

*Maloney-Refaie v. Bridge at School, Inc.,*
958 A.2d 871 (Del. Ch. 2008) ................................................ 44

*Marshall v. Warwick,*
155 F.3d 1027 (8th Cir. 1998) ................................................ 15

*Medi–Tec of Egypt Corp. v. Bausch & Lomb Surgical,*
No. Civ. A. 19760, 2004 WL 415251 (Del. Ch. Mar. 4, 2004) ............... 39

*Mobil Oil Corp. v. Linear Films, Inc.,*
718 F. Supp. 260 (D. Del. 1989) ............................................. 39

*Mohawk Indus., Inc. v. Carpenter,*
558 U.S. 100 (2009) ...................................................... 1, 18, 20

*Montaño v. City of Chi.,*
375 F.3d 593 (7th Cir. 2004) ............................................... 3, 20

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,*
526 U.S. 344 (1999) ............................................................. 26

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
132 S. Ct. 2566 (2012) ......................................................... 31

*Neely v. Club Med. Mgmt. Servs., Inc.,*
63 F.3d 166 (3d Cir. 1995) .................................................... 29

*New York State Elec. & Gas Corp. v. FirstEnergy Corp.,*
766 F.3d 212 (2d Cir. 2014) .................................................. 15

*Norfolk & W. Ry. v. Am. Train Dispatchers' Ass'n,*
499 U.S. 117 (1991) ............................................................. 33

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,*
484 U.S. 97 (1987) .............................................................. 15

*On Command Video Corp. v. Roti,*
705 F.3d 267 (7th Cir. 2013) ................................................ 38

*Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.,*
685 A.2d 724 (Del. Super. Ct. 1996) ....................................... 42

*Pauley Petroleum Inc. v. Continental Oil Co.,*
239 A.2d 629 (Del. 1968) ...................................................... 40

**Cases—Continued:**          **Page(s)**

*Pauley Petroleum, Inc. v. Continental Oil Co.,*
231 A.2d 450 (Del. Ch. 1967) ............................................. 41

*Plastics Eng'g Co. v. Liberty Mut. Ins. Co.,*
514 F.3d 651 (7th Cir. 2008) ......................................... 45, 46

*Plummer v. Sherman,*
861 A.2d 1238 (Del. 2004) ................................................ 44

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,*
506 U.S. 139 (1993) ........................................................ 21

*Pullman Constr. Indus., Inc. v. United States,*
23 F.3d 1166 (7th Cir. 1994) ............................................ 21

*Reid v. Siniscalchi,*
No. 2874-VCN, 2011 WL 378795 (Del. Ch. Jan. 31, 2011) ................... 40

*Republic of Philippines v. Pimentel,*
553 U.S. 851 (2008) ........................................................ 20

*Rive v. Briggs of Cancun, Inc.,*
82 F. App'x 359 (5th Cir. 2003) ......................................... 15

*Rodman Indus., Inc. v. G&S Mill, Inc.,*
145 F.3d 940 (7th Cir. 1998) ............................................ 43

*Rubin v. Islamic Republic of Iran,*
637 F.3d 783 (7th Cir. 2011) ............................................ 22

*Ruggiero v. FuturaGene, plc,*
948 A.2d 1124 (Del. Ch. 2008) .......................................... 40

*Salve Regina College v. Russell,*
499 U.S. 225 (1991) ........................................................ 15

*Sears, Roebuck & Co. v. Sears plc,*
744 F. Supp. 1297 (D. Del. 1990) ....................................... 42

*Segni v. Commercial Office of Spain,*
816 F.2d 344 (7th Cir. 1987) ............................................ 22

*Sell v. United States,*
539 U.S. 166 (2003) ........................................................ 23

*Sonne v. Sacks,*
314 A.2d 194 (Del. 1973) ................................................ 43

*Sprint Nextel Corp. v. iPCS, Inc.,*
No. 3746, 2008 WL 2737409 (Del. Ch. July 14, 2008) .................... 41

*Stanley Works v. Globemaster, Inc.,*
400 F. Supp. 1325 (D. Mass. 1975) ...................................... 36

**Cases—Continued:** Page(s)

*Sundstrand Corp. v. Commissioner*,
  17 F.3d 965 (7th Cir. 1994) ............................................................. 28

*Swint v. Chambers Cnty. Comm'n*,
  514 U.S. 35 (1995) .................................................................... 2, 18

*Terry Apartments Assocs. v. Associated-East Mortg. Co.*,
  373 A.2d 585 (Del. Ch. 1977) ......................................................... 41

*Theravectys SA v. Immune Design Corp.*,
  No. C.A. No. 9950–VCN, 2014 WL 5500506 (Del. Ch. Oct. 31, 2014) .................... 39

*Thomas v. H&R Block E. Enters., Inc.*,
  630 F.3d 659 (7th Cir. 2011) ......................................................... 46

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
  30 F.3d 148 (D.C. Cir. 1994) ......................................................... 22

*United States v. Alfred L. Wolff GmbH*,
  No. 08-cr-417, 2011 WL 4471383 (N.D. Ill. Sept. 26, 2011) ........... 13, 35, 42, 48, 52

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ............................................................ 12, 26, 34, 51

*United States v. Bokhari*,
  757 F.3d 664 (7th Cir. 2014) ............................................... 18, 22, 23, 25

*United States v. Bowman*,
  260 U.S. 94 (1922) ................................................................... 29

*United States v. Chitron Elecs. Co.*,
  668 F. Supp. 2d 298 (D. Mass. 2009) ............................................... 13, 36

*United States v. Elmes*,
  532 F.3d 1138 (11th Cir. 2008) ....................................................... 15

*United States v. Hagler*,
  700 F.3d 1091 (7th Cir. 2012) ........................................................ 28

*United States v. Johnson Matthey Plc*,
  No. 2:06-cr-169, 2007 WL 2254676 (D. Utah Aug. 2, 2007) ............... 13, 27, 35, 48

*United States v. Kashamu*,
  656 F.3d 679 (7th Cir. 2011) ............................................... 18, 22, 23

*United States v. Kolon Indus., Inc.*,
  926 F. Supp. 2d 794 (E.D. Va. 2013) ....................................... 13, 35, 42, 48

*United States v. Kolon Indus., Inc.*,
  No. 3:12-cr-137 (E.D. Va. May 2, 2014) (ECF No. 132) ............................... 13

*United States v. LeShore*,
  543 F.3d 935 (7th Cir. 2008) ......................................................... 14

**Cases—Continued:** Page(s)

*United States v. Li,*
  55 F.3d 325 (7th Cir. 1995) ................................................. 15

*United States v. MacDonald,*
  435 U.S. 850 (1978) ........................................................... 24

*United States v. Michalek,*
  54 F.3d 325 (7th Cir. 1995) ................................................. 30

*United States v. Nippon Paper Indus. Co.,*
  944 F. Supp. 55 (D. Mass. 1996),
  *rev'd on other grounds,* 109 F.3d 1 (1st Cir. 1997) ................ 29

*United States v. Pangang Grp. Co.,*
  879 F. Supp. 2d 1052 (N.D. Cal. 2012) ............... 13, 35, 42, 48

*United States v. Porter,*
  No. 03-cr-129, 2008 WL 5377946 (E.D.N.Y. Dec. 23, 2008) ......... 47

*United States v. Public Warehousing Co. K.S.C.,*
  No. 1:09-cr-490, 2011 WL 1126333 (N.D. Ga. Mar. 28, 2011) ........ 13, 14, 36

*United States v. Public Warehousing Co. K.S.C.,*
  No. 1:09-cr-490-TW (N.D. Ga. Sept. 2, 2010) (ECF No. 133)
  *rev'd* 2011 WL 1126333 ...................................................... 13

*United States v. Rinaldi,*
  351 F.3d 285 (7th Cir. 2003) ............................................... 14

*United States v. Sorren,*
  605 F.2d 1211 (1st Cir. 1979) .............................................. 21

*United Steelworkers of Am. v. Connors Steel Co.,*
  855 F.2d 1499 (11th Cir. 1988) ........................................... 36

*Van Cauwenberghe v. Biard,*
  486 U.S. 517 (1988) ........................................................... 24

*Volkswagenwerk Aktiengesellschaft v. Schlunk,*
  486 U.S. 694 (1988) ..................................................... 26, 34

*Will v. Hallock,*
  546 U.S. 345 (2006) ...................................................... 2, 20

*Zhai v. Stein,*
  No. 10C-11-079, 2012 WL 1409358 (Del. Super. Ct. Jan. 6, 2012) ...... 14, 43, 44, 46

**Statutes:**

15 U.S.C. § 22 ....................................................................... 29

18 U.S.C. § 2 ......................................................................... 1

ix

**Statutes—Continued:**                                                  **Page(s)**

18 U.S.C. § 371 ........................................................................ 1

18 U.S.C. § 687 ........................................................................ 5

18 U.S.C. § 1343 ...................................................................... 1

18 U.S.C. § 1832(a)(2) ............................................................. 1

18 U.S.C. § 3231 ...................................................................... 1

28 U.S.C. § 723c ...................................................................... 5

28 U.S.C. § 1291 ..................................................... 1, 3, 15, 18

28 U.S.C. § 1651 ..................................................... 3, 16, 25

28 U.S.C. § 1694 .................................................................... 36

28 U.S.C. § 2074 .................................................................... 24

**Rules:**

7th Cir. R. 28(a)(3)(ii) .............................................................. 1

7th Cir. R. 52(a) ..................................................................... 45

Del. Sup. Ct. R. 41(a)(ii) .................................................. 45, 46

Del. Sup. Ct. R. 41(b)(ii) ........................................................ 46

Del. Sup. Ct. R. 41(b)(iii) ....................................................... 46

Fed. R. Civ. P. 4 ............................................................ *passim*

Fed. R. Civ. P. 4(f) ............................................................. 5, 6

Fed. R. Civ. P. 4(f) (1939) ..................................................... 30

Fed. R. Civ. P. 4(f)(1) ........................................................... 28

Fed. R. Civ. P. 4(f)(2) ........................................................... 28

Fed. R. Civ. P. 4(f)(3) ........................................................... 28

Fed. R. Civ. P. 4(h) ............................................................... 28

Fed. R. Civ. P. 4(h)(1)-(2) ...................................................... 6

Fed. R. Civ. P. 12(b) .............................................................. 34

Fed. R. Civ. P. 12(b)(2) .......................................................... 34

Fed. R. Civ. P. 12(b)(5) .......................................................... 34

Fed. R. Crim. P. 4 ......................................................... *passim*

Fed. R. Crim. P. 4(c) ......................................................... 7, 32

Fed. R. Crim. P. 4(c)(1) ........................................................... 6

**Rules—Continued:**                                                                          **Page(s)**

Fed. R. Crim. P. 4(c)(2) ...................................................................... 6, 31

Fed. R. Crim. P. 4(c)(2) (1946)........................................................... 5, 31

Fed. R. Crim. P. 4(c)(3) ........................................................................... 6

Fed. R. Crim. P. 4(c)(3)(C) ............................................................... *passim*

Fed. R. Crim. P. 9(a) ............................................................................... 6

Fed. R. Crim. P. 9(b) ............................................................................... 6

Fed. R. Crim. P. 9(c)................................................................................ 6

Fed. R. Crim. P. 9(c)(1) ....................................................................... 5, 31

**Other Authorities:**

Spencer Ackerman & Jonathan Kaiman, *Chinese Military Officials Charged With Stealing US Data as Tensions Escalate*, The Guardian (May 20, 2014)......... 9

Erin Ailworth, *Chinese Firm Charged with Stealing Tech from Mass. Company*, Boston Globe (June 27, 2013) ............................................................ 11

AMSC, Press Release, *AMSC Provides Update on Litigation with Sinovel Wind Group, Ltd* (Sept. 16, 2014)............................................................. 9

AMSC, Press Release, *China's Sinovel Indicted in the United States for Stealing AMSC Trade Secrets* (June 27, 2013)...................................................... 11

Philip I. Blumberg et al., *Blumberg on Corporate Groups* (2d ed. 2005).................. 34

Einer Elhauge, *Statutory Default Rules: How to Interpret Unclear Legislation* (2008) .................................................................................... 24

Hearing on Proposed Amendments to Federal Sentencing Guidelines (Mar. 13, 2013) (testimony of John W. Powell) ...................................................... 10

Alexander Holtzoff, *Origin and Sources of the Federal Rules of Civil Procedure*, 30 N.Y.U. L. Rev. 1057 (1955) ......................................................... 5, 30

Judicial Assistance Agreement Between the United States of America and China (June 19, 2000) ..................................................................... 51

Jonathan Kaiman, *China Reacts Furiously to US Cyber-Espionage Charges*, The Guardian (May 20, 2014)............................................................. 10

Memorandum from Hon. Reena Raggi, Chair, Advisory Committee on Criminal Rules, to Hon. Jeffrey S. Sutton, Chair, Committee on Rules of Practice & Procedure (May 5, 2014) ................................................................. 8

Proposed Amendments to the Fed. Rules of App., Bankr., Civ., and Crim. Proc. (Aug. 2014) .......................................................................... 8, 32

**Other Authorities—Continued:**                                        **Page(s)**

Restatement (Third) of Foreign Relations Law (1987)................................................. 29

Subcommittee Memorandum from Professors Sara Sun Beale and Nancy King
    to Criminal Rules Advisory Committee (Sept. 24, 2013).................................... 7, 32

U.S. Dep't of State, Treaties in Force 2011—Bilateral Treaties in Force as of
    Jan. 1, 2011 ........................................................................................................ 51

Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* (1969) .......... 47

Charles A. Wright et al., *Federal Practice & Procedure* (3d ed. 2014) ...... 4, 26, 34, 35

Jianxiang Yang, *AMSC Takes Sinovel Case to Beijing High Court*, WindPower
    Monthly (Nov. 7, 2011).................................................................................... 9

## JURISDICTIONAL STATEMENT

This appeal arises from the criminal prosecution of Sinovel Wind Group Co. Ltd., ("Sinovel"), a Chinese corporation whose principal place of business is in China and which is partially owned by the Chinese government, for alleged offenses under 18 U.S.C. §§ 371, 1343, 1832(a)(2), and 2. The District Court had jurisdiction under 18 U.S.C. § 3231.

The District Court entered an order denying Sinovel's motion to quash service of process on September 10, 2014. A-1 to -6. Sinovel timely filed its notice of appeal on September 11, 2014. Doc. 84.[1] Sinovel also petitioned for a writ of mandamus in this Court on September 24, 2014. After ordering the parties to submit memoranda addressing this Court's jurisdiction to consider the appeal, this Court consolidated the appeal and mandamus petition, and directed that the cases proceed to briefing and oral argument. Order (Nov. 10, 2014).[2]

This Court has appellate jurisdiction under 28 U.S.C. § 1291 and the collateral-order doctrine. *See, e.g.*, *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). That doctrine applies when a decision (1) is "conclusive" of the disputed question; (2) "resolve[s] [an] important question[] separate from the merits;" and (3) is "effectively unreviewable on appeal from the final judgment in the underlying

---

[1] "Doc." citations are to the District Court docket.

[2] This Court directed the parties to brief both "the jurisdictional issue and underlying merits issue." *Id.* Sinovel addresses jurisdiction both in this Jurisdictional Statement, *see* 7th Cir. R. 28(a)(3)(ii), and in Part I of the Argument, *infra*.

action." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 41-42 (1995). Each requirement is satisfied here.

First, the District Court's order "conclusive[ly]" determines whether the government properly served Sinovel with a criminal summons. *See* A-6. The District Court held that "the motion to quash the government's service . . . is DENIED" and that "no further showing need be made to support this court's exercise of jurisdiction over [Sinovel]." *Id.* Sinovel can take "no further steps" in the District Court to contest the validity of service. *Abney v. United States*, 431 U.S. 651, 659 (1977). The government's jurisdictional memorandum made no argument to the contrary.

Second, the order resolves an important question separate from the merits. The indictment alleges that Sinovel and others committed theft of trade secrets, conspiracy, and wire fraud. A-36 to -47. Valid service is a question "completely collateral" (*Abney*, 431 U.S. at 658) to whether Sinovel committed those criminal offenses. Again, the government has not disagreed.

Third, the denial of Sinovel's motion to quash is effectively unreviewable after final judgment. The collateral-order doctrine allows an immediate appeal if delaying review would "imperil a substantial public interest" or "some particular value of a high order," *Will v. Hallock*, 546 U.S. 345, 352-53 (2006), if "appellate review must occur before trial to be fully effective," *Flanagan v. United States*, 465 U.S. 259, 266 (1984), or where the issue is "too important to be denied review and too independent of the cause itself to require that appellate consideration be

deferred until the whole case is adjudicated," *Montaño v. City of Chi.*, 375 F.3d 593, 598 (7th Cir. 2004).  As detailed below, those standards are satisfied where, as here, denying a motion to quash service would subject a foreign, partially state-owned corporation to a U.S. criminal trial.

Independently, this Court has jurisdiction to entertain Sinovel's petition for writ of mandamus under the All Writs Act, 28 U.S.C. § 1651.

## STATEMENT OF ISSUES

1.    Does this Court have jurisdiction, under 28 U.S.C. § 1291 and the collateral-order doctrine, to hear an immediate appeal from the District Court's order denying a motion to quash criminal service of process on a partially state-owned foreign corporation?

2.    May a District Court excuse prosecutors' failure to satisfy two independent and unambiguous requirements for criminal service of process on a foreign corporation under Federal Rule of Criminal Procedure 4, based on an atextual and novel "alter-ego" or veil-piercing theory?

3.    Did the District Court err by relieving the government of its obligation to prove that Sinovel used the corporate form to perpetrate fraud or similar injustice, a mandatory element of alter ego under governing Delaware law?

4.    Did the District Court clearly err by piercing the corporate veil on the government's flimsy factual showing, based on aspects of the parent-subsidiary relationship that are common to thousands of multinational corporations, and despite proper observance of corporate formalities?

3

## STATEMENT OF THE CASE

This case concerns whether the federal government may validly serve a partly state-owned foreign corporation with no presence in the United States, despite satisfying *neither* of the two explicit and mandatory requirements Federal Rule of Criminal Procedure 4 establishes for service of process on an organization: (1) "deliver[ing] a copy [of the summons] to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process," and (2) "mail[ing] [the summons] to the organization's last known address within the district or to its principal place of business elsewhere in the United States." Fed. R. Crim. P. 4(c)(3)(C) (reproduced at A-49 to -50). The court below broke with the majority of courts to consider the question, and became only the third court in U.S. history to recognize a novel veil-piercing theory that allows criminal service through a U.S. subsidiary. The District Court's conclusion disregards the fact that veil-piercing was developed under the very different language of Civil Rule 4 (which explicitly allows extraterritorial service), and the government's recognition that Criminal Rule 4 must be amended to address this issue. The Court should reverse.

## I.    Legal Background

The Federal Rules of Procedure establish minimum requirements by which a defendant is informed of allegations against it and formally brought under a district court's jurisdiction. *See* 4 Charles A. Wright et al., *Federal Practice & Procedure* § 1063 (3d ed. 2014) (proper service of a summons and complaint "marks the court's

assertion of jurisdiction over the lawsuit").  The rules' text, purpose and history inform the jurisdictional question presented here.

**A.**     **Historically, the civil and criminal rules imposed territorial limitations on service of process**

Before the codification of the Federal Rules of Civil Procedure, service of a civil summons could be effected only within the district where a case was filed.  *See* Alexander Holtzoff, *Origin and Sources of the Federal Rules of Civil Procedure*, 30 N.Y.U. L. Rev. 1057, 1063-64 (1955).  The first Civil Rules "enlarge[d]" the areas where service was permissible (Fed. R. Civ. P. 4, advisory committee's note to subdiv. (f) (1937)), but allowed service beyond the territorial limits of the state in which the district court was situated only "when a statute of the United States so provides."  Fed. R. Civ. P. 4(f) (1939), *reprinted in* 28 U.S.C. § 723c, at p. 856 (Supp. V 1939) (reproduced in Mandamus App. A-54).

The first *criminal* rule on service of a summons was not issued until 1946.  It also imposed "[t]erritorial [l]imits," stating that "[t]he . . . summons may be served at any place *within* the jurisdiction of the United States."  Fed. R. Crim. P. 4(c)(2) (1946) (emphasis added), *reprinted in* 18 U.S.C. § 687, at p. 1961 (1946) (reproduced in Mandamus App. A-56); *see also id.* 9(c)(1) (governing service on organization), *reprinted in* 18 U.S.C. § 687, at p. 1966 (1946).  Despite amendments, the criminal rule retains the same feature today, specifying that "a summons [may be] served[] within the jurisdiction of the United States or anywhere else a federal statute authorizes an arrest."  Fed. R. Crim. P. 4(c)(2).

**B.    Criminal Rule 4 contains mandatory requirements for serving an organization**

When, as here, the government proceeds by indictment, "[t]he court must issue a warrant—or at the government's request, a summons—for each defendant named." Fed. R. Crim. P. 9(a).  Rule 9 further requires that "the summons [be] served as provided in Rule 4(c)(1), (2), and (3)."  *Id.* 9(b), (c).  Rule 4(c)(3), in turn, specifies the "[m]anner" in which "[a] summons *is served* on an organization."  In particular, the government must:

> (1) "*deliver*[] a copy [of the summons] to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process"; *and*

> (2) "*mail*[]" the summons to a known address within the district where the government has chosen to prosecute, or the defendant's "principal place of business elsewhere in the United States."

Fed. R. Crim. P. 4 (c)(3)(C) (emphasis added).

Criminal Rule 4's mandatory language and focus on U.S. territorial jurisdiction contrast with the permissive terms and breadth of the parallel civil rule.  Civil Rule 4 specifies how "a domestic or foreign corporation" may be served, including "at a place not within any judicial district of the United States."  Fed. R. Civ. P. 4(h)(1)-(2).  Unlike its criminal counterpart, the civil rule expressly authorizes service "in any manner prescribed by Rule 4(f) for serving an individual."  *Id.* 4(h)(2).  Civil Rule 4(f), in turn, contemplates service "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents"; absent such an agreement, by various means "unless

prohibited by the foreign country's law"; or "by other means not prohibited by international agreement, as the court orders." *Id.* 4(f)(1)-(3).

C.    <u>**Since 2012, the Department of Justice has been working to amend Criminal Rule 4 to allow service abroad**</u>

In October 2012, the head of the Department of Justice's ("DOJ") Criminal Division formally requested that the Advisory Committee amend Criminal Rule 4(c)(3)(C) "to permit the effective service of a summons on a foreign organization[al defendant] that has no agent or principal place of business within the United States." Doc. 51-2 at 1 (Mandamus App. A-58 to -67), *available at* http://goo.gl/U5MXlI (pp. 317-25). The amendment, DOJ explained, was "*necessary in order to effectively prosecute foreign organizations,*" because "Rule 4 can be and has been read to preclude jurisdiction in criminal cases" against foreign organizations that lack a U.S. agent or address. *Id.* at 1, 5 (emphasis added). DOJ proposed expanding Criminal Rule 4(c) to include five new means of service "at a place not within a judicial district of the United States." *Id.* at 1, 6-9.

A subcommittee agreed with DOJ that the Rule's "mailing requirement" is "a major impediment" to serving foreign organizations. *See* Subcommittee Memorandum from Professors Sara Sun Beale and Nancy King to Criminal Rules Advisory Committee 3-4 (Sept. 24, 2013) (Mandamus App. A-68 to -77), *available at* http://goo.gl/DPO3An (pp. 117-25). In May 2014, the Advisory Committee recommended amending Rule 4 to address concerns that certain "corporations cannot be served" under the existing rule "because they have no last known address or principal place of business in the United States." Memorandum from Hon. Reena

Raggi, Chair, Advisory Committee on Criminal Rules, to Hon. Jeffrey S. Sutton, Chair, Committee on Rules of Practice & Procedure 2 (May 5, 2014) (Mandamus App. A-78 to 90), *available at* http://goo.gl/XBEVii (pp. 477-88).  Under current Rule 4, the Advisory Committee explained, "*in every case involving an organizational defendant . . . it is not possible* to serve a foreign entity" that has neither "a principal place of business in the U.S. nor a known address within the district."  *Id.* at 3 (emphasis added).

On August 15, 2014, the Committee on Rules of Practice and Procedure proposed formal amendments, recognizing that current Rule 4 is an "impediment" to prosecuting foreign companies, and authorizing service "on an organization not within a judicial district of the United States," including in a manner "authorized by the foreign jurisdiction's law" or "permitted by an applicable international agreement."  Proposed Amendments to the Fed. Rules of App., Bankr., Civ., and Crim. Proc. 321, 333-34 (Aug. 2014) (Mandamus App. A-91 to -100), *available at* http://goo.gl/4S3CZP.  The proposed amendments identify specific service methods, such as means "permitted by an applicable international agreement."  *Id.* at 333-34. The public comment period will close in February 2015, and (assuming no changes), the amendments will take effect in December 2016.

## II.    Factual Background

### A.    <u>A civil contract dispute arises between Sinovel and AMSC</u>

Sinovel, a Chinese company located in Beijing, manufactures, sells, exports, and services wind turbines.  A-39 ¶ 6.  Two Chinese state-owned entities (including a national Social Security fund) collectively own 18% of Sinovel's stock.  Doc. 54 ¶ 3.

Sinovel purchases software and equipment from various third parties.  A-39 ¶ 6.  Among Sinovel's vendors was AMSC (formerly American Superconductor), which develops and sells software and equipment to regulate the flow of electricity from wind turbines to electrical grids.  Sinovel "legitimately purchased software and equipment from AMSC," paying hundreds of millions of dollars to AMSC for certain rights to possess and use the software.  *Id.*

Beginning in March 2011, differences arose about the scope of Sinovel's rights under the software contracts.  AMSC filed civil actions against Sinovel in China, including breach-of-contract claims at the Beijing Arbitration Commission, and trade-secret and copyright claims in three Chinese courts.  *See* Jianxiang Yang, *AMSC Takes Sinovel Case to Beijing High Court*, WindPower Monthly (Nov. 7, 2011), *available at* http://goo.gl/Ry2tgc.  The Chinese courts dismissed some of those claims, but allowed others to proceed.  That civil litigation remains ongoing.  *See* AMSC, Press Release, *AMSC Provides Update on Litigation with Sinovel Wind Group, Ltd* (Sept. 16, 2014), *available at* http://goo.gl/34WSE2.

### B.    AMSC successfully lobbies for this criminal prosecution

While the Chinese civil litigation was ongoing, AMSC launched a high-profile political campaign, seeking to escalate the contract dispute into a federal criminal prosecution.  AMSC leveraged high-ranking U.S. government contacts, and painted the case as exacerbating longstanding diplomatic tensions[3] over alleged state-

---

[3] *See, e.g.*, Spencer Ackerman & Jonathan Kaiman, *Chinese Military Officials Charged With Stealing US Data as Tensions Escalate*, The Guardian (May 20, 2014), *available* at http://goo.gl/2wW7N8; Jonathan Kaiman, *China Reacts*

sponsored cybercrimes and theft of trade secrets. In March 2013, AMSC's Vice President and General Counsel testified before the U.S. Sentencing Commission, alleging that Sinovel stole trade secrets and engaged in espionage. *See* Hearing on Proposed Amendments to Federal Sentencing Guidelines 3-4 (Mar. 13, 2013) (testimony of John W. Powell), *available at* http://goo.gl/6ul5dt. The testimony emphasized that Sinovel was "partially state owned" and linked this case to a "rise in state sponsored trade secret theft." *Id.* at 2, 6-7. AMSC implored the Commission to increase sentences where a crime is "committed to benefit a foreign government." *Id.* at 6-7.

Soon afterward, the government filed a criminal complaint charging Sinovel with theft of trade secrets. The complaint named the defendant as "Sinovel Wind Group Co., Ltd. d/b/a Sinovel Wind Group (USA) Co., Ltd." Doc. 8 at 1. Sinovel Wind Group (USA) Co., Ltd. ("Sinovel USA") is a Delaware corporation and subsidiary of Sinovel, established to engage in wind-turbine business in its own name in the United States. Doc. 54 ¶¶ 6-10.

An FBI affidavit supporting the complaint confirmed AMSC's close involvement in the investigation, explaining that an FBI Special Agent "reviewed . . . [key] electronic evidence" "[i]n consultation with AMSC engineers." Doc. 8-1 ¶ 25. The affidavit relied on "extensive analysis" "conducted" by a "Senior AMSC Software Manager," and that manager's "determin[ation]" that software in certain Massachusetts wind turbines was "generated from" AMSC source code. That AMSC

---

*Furiously to US Cyber-Espionage Charges*, The Guardian (May 20, 2014), *available at* http://goo.gl/zhuVaX.

determination is the central allegation in both the criminal case and ongoing civil litigation in China.  *Id.* ¶¶ 7-8, 13-19, 25-26.

On June 27, 2013, a grand jury returned a three-count indictment naming "Sinovel Wind Group Co., Ltd. dba Sinovel Wind Group (USA) Co., Ltd."  A-38 to -39.  The indictment charged theft of trade secrets, conspiracy, and wire fraud.  A-40 to -48.  AMSC immediately issued a press release trumpeting its role "work[ing] with law enforcement" to secure the criminal charges.  AMSC, Press Release, *China's Sinovel Indicted in the United States for Stealing AMSC Trade Secrets* (June 27, 2013), *available at* http://goo.gl/6CMvSo.  AMSC claimed "strong support" from officials "within various branches of the U.S. . . . government[]," including (among others) Vice President Joe Biden, former Secretary of State Hillary Clinton, and current Secretary of State John Kerry.  *Id.*  AMSC also stated that its dispute with Sinovel was "on the agendas of President Barack Obama [and] Chinese President Xi Jinping."  Erin Ailworth, *Chinese Firm Charged with Stealing Tech from Mass. Company*, Boston Globe (June 27, 2013), *available at* http://goo.gl/XbwP6u.

## C.   The government tries to serve Sinovel through a U.S. subsidiary

After questions arose about whether the government had validly served Sinovel with a criminal summons, the government filed a letter detailing several scattershot (but largely overlapping) attempts to serve Sinovel.  *See* Doc. 36 (Mandamus App. A-51 to -52). According to that letter, the government transmitted

various versions of a summons to the Houston office of, and Delaware and Texas registered agents for, Sinovel USA.[4]

### D.    The government invokes a novel "alter-ego" theory of service

Pursuant to a special appearance, Sinovel moved to quash service of process. Doc. 50.  Sinovel explained that the government had not satisfied either of Criminal Rule 4's requirements.  Doc. 51 at 13-23.  First, the government had not "deliver[ed] a copy" of the summons "'to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service'" for Sinovel.  *Id.* at 13 (quoting Fed. R. Crim. P. 4(c)(3)(C)).  Second, the government had not mailed the summons to Sinovel's "'last known address within the district or to its principal place of business elsewhere in the United States.'"  *Id.* (quoting Fed. R. Crim. P. 4(c)(3)(C)).  Rather, as Sinovel explained, the government relied exclusively on serving Sinovel USA, a distinct corporate entity.  *See id.* at 17-24.  In response, the government argued that the Court should import an "alter ego" (or veil-piercing) theory from civil personal-jurisdiction cases, and that Sinovel USA was the alter ego of its Chinese parent.  *See* Doc. 55.

### E.    The District Court adopts the government's alter-ego theory

Magistrate Judge Stephen L. Crocker denied Sinovel's motion to quash.  A-8 to -35.  Judge Crocker acknowledged the general rule that "service on a subsidiary generally does not constitute service on a corporate parent," A-20 (citing *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998)), but nonetheless accepted the

---

[4] The efforts involved four different versions of the summons.  *Id.*

government's alter-ego theory.  A-20 to -23.  Noting that the government faced "an uphill slog" to "pierc[e] the corporate veil in the criminal context," A-23, Judge Crocker repeatedly expressed doubt whether the government had met its burden. *E.g.*, A-32 (case is "concededly a wobbler"); A-21 (finding it decidedly "not clear whether it is appropriate to use th[e] [alter ego] standard in th[e] [criminal] context").  He ultimately denied the motion to quash.  A-34 to -35.

Sinovel timely objected, but District Judge Barbara Crabb denied the motion to quash in a terse five-page opinion.  A-1 to -6.  The District Court cited only a handful of authorities, included no record citations, and offered limited analysis. *See id.*  While acknowledging that "twice as many" courts have rejected application of the civil alter-ego doctrine in a criminal prosecution as have allowed it, A-3, the District Court sided with the two (out-of-circuit) cases ever to have sustained that approach.  A-4 to -5 (citing *United States v. Chitron Elecs. Co.*, 668 F. Supp. 2d 298 (D. Mass. 2009); *United States v. Pub. Warehousing Co.*, No. 1:09-cr-490, 2011 WL 1126333 (N.D. Ga. Mar. 28, 2011)).[5]

---

[5] As the District Court acknowledged, the "majority" (A-3) of courts have quashed criminal service where the government relied on an alter-ego theory. *United States v. Alfred L. Wolff GmbH*, No. 08-cr-417, 2011 WL 4471383 (N.D. Ill. Sept. 26, 2011); *United States v. Pangang Grp. Co.*, 879 F. Supp. 2d 1052, 1056-57 (N.D. Cal. 2012); *United States v. Kolon Indus., Inc.*, 926 F. Supp. 2d 794 (E.D. Va. 2013); *United States v. Johnson Matthey Plc*, No. 2:06-cr-169, 2007 WL 2254676 (D. Utah Aug. 2, 2007); *see also* Order, *United States v. Kolon Indus., Inc.*, No. 3:12-cr-137 (E.D. Va. May 2, 2014), ECF No. 132 ("*Kolon* Order") (Mandamus App. A-114 to -115); Order, *United States v. Pangang Grp. Co.*, No. 11-cr-573 (N.D. Cal. Apr. 8, 2013), ECF No. 293 ("*Pangang* Order") (Mandamus App. A-101 to -112); Report & Recommendation, *United States v. Pub. Warehousing Co. K.S.C.*, No. 1:09-CR-490-TW (N.D. Ga. Sept. 2, 2010), ECF No. 133, *rev'd*, 2011 WL 1126333.

The District Court adopted a novel test for veil-piercing: "To obtain jurisdiction over [a foreign] defendant, the government has to show only that [a subsidiary] . . . has no independent reason for existence." A-6. The court accepted the government's contention that, under Delaware law, veil-piercing should be easier for "jurisdiction[al]" purposes than for substantive liability, giving dispositive weight to dicta from one Delaware trial-court decision. *Id.* (citing *Zhai v. Stein*, No. 10C-11-079, 2012 WL 1409358, at *7 (Del. Super. Ct. Jan. 6, 2012)). The District Court ignored the myriad Delaware appellate cases to the contrary, which require proof that the defendant used the corporate form to commit fraud or injustice.

In applying its novel alter-ego standard, the District Court cited precisely four facts: that some internal Sinovel documents referred to Sinovel USA as a "branch office"; that Sinovel "close[ly] supervis[ed]" its subsidiary's activities; that Sinovel "control[led]" its subsidiary's finances; and that one Sinovel employee working temporarily in the United States occasionally (mis)represented that he worked for Sinovel USA. A-3. The opinion contains no suggestion that Sinovel USA disregarded traditional corporate formalities, was undercapitalized, or perpetrated fraud or any other criminal act—the traditional veil-piercing indicia.

## STANDARD OF REVIEW

**I.** This Court determines *de novo* whether it has jurisdiction to hear a collateral-order appeal. *See United States v. Rinaldi*, 351 F.3d 285, 288 (7th Cir. 2003).

**II.** This Court "review[s] the district court's interpretation of the Federal Rules . . . *de novo*." *United States v. LeShore*, 543 F.3d 935, 941 (7th Cir. 2008).

14

Appellate courts "review *de novo* the determination [whether] service of process was insufficient." *Marshall v. Warwick*, 155 F.3d 1027, 1030 (8th Cir. 1998); *accord United States v. Elmes*, 532 F.3d 1138, 1141 (11th Cir. 2008); *Greene v. Holloway*, 210 F.3d 361, *1 (4th Cir. 2000) (unpublished). This Court also generally reviews jurisdictional issues *de novo. See United States v. Li*, 55 F.3d 325, 328-29 (7th Cir. 1995); *see also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) (service of process is prerequisite to exercise of jurisdiction over defendant).

**III.** This Court's "review of a district court's interpretation of state law"— including the requirements for piercing the corporate veil under Delaware law—"is in the fullest sense de novo." *Lawshe v. Simpson*, 16 F.3d 1475, 1478 (7th Cir. 1994) (quotation marks omitted; citing *Salve Regina College v. Russell*, 499 U.S. 225 (1991)).

**IV.** Although this Court does not appear to have squarely addressed the question, other courts review a "district court's . . . decision[] whether to pierce the corporate veil . . . *de novo.*" *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 221 (2d Cir. 2014). To the extent such a decision involves "factual determination[s]," some courts review those findings for clear error, but underlying questions of law are reviewed *de novo. Rive v. Briggs of Cancun, Inc.*, 82 F. App'x 359, 362 (5th Cir. 2003).

## SUMMARY OF ARGUMENT

**I.** This Court has jurisdiction to review the District Court's order under 28 U.S.C. § 1291 and the collateral-order doctrine, because the denial of Sinovel's motion to quash is final, separate from the merits, and effectively unreviewable on

appeal.  Immediate appeal is necessary to avoid irreparable injury to U.S.-Chinese diplomatic relations and the reputational and comity concerns posed by a criminal prosecution of a partially state-owned foreign company.  Alternatively, 28 U.S.C. § 1651 grants this Court jurisdiction to issue a writ of mandamus.

**II.**   Under Criminal Rule 4, the government must "deliver a copy [of the summons] to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process" and "must" also "mail[] [the summons] to the organization's last known address within the district or to its principal place of business elsewhere in the United States."   Fed. R. Crim. P. 4(c)(3)(C).

The government here satisfied *neither* requirement.  Instead, it advances a novel veil-piercing theory developed in civil personal-jurisdiction cases.  By accepting that theory, the District Court reached a result literally without precedent in this Circuit, and condoned by only two other courts in history.  In contrast to the parallel rule addressing service in *civil* cases, Criminal Rule 4 does not authorize extraterritorial service on a foreign organization through a subsidiary.  Indeed, since 2012 the government has been actively seeking to amend the rule, to authorize this kind of extraterritorial service.  The only two (trial-court) decisions in U.S. history to have pierced the corporate veil for criminal service featured unique facts not present here.  The majority of courts to have considered this issue have *rejected* attempts to effect criminal service of process on a foreign corporation through a U.S. subsidiary.

16

**III.** The District Court also misapplied controlling Delaware law, which prohibits piercing the corporate veil without proof that the defendant used the corporate form to commit fraud or similar injustice. The government has not even *alleged*, never mind sought to prove, that Sinovel used the corporate form to perpetrate fraud or injustice. In contrast to the heavy burden long imposed on those seeking to pierce the corporate veil, *see, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003), the District Court erred by adopting a vague and capacious standard for veil-piercing—whenever a subsidiary might be said to lack an "independent reason for existence."

**IV.** The District Court clearly erred when it pierced Sinovel's corporate veil on the flimsy factual showing here, and based on features common to myriad parent-subsidiary relationships. It does not risk overstatement to suggest that the District Court's rationale and result effectively repeal Rule 4 for countless foreign corporations with a small U.S. subsidiary.

The District Court exacerbated its error by excusing the government from even *attempting* to serve Sinovel through available diplomatic channels. The U.S. and China have a longstanding formal agreement for mutual assistance in criminal matters, including diplomatic requests for extraterritorial service. Courts have correctly required the government to avail itself of existing channels before improvising novel theories of criminal service.

## ARGUMENT

## I.     This Court Has Collateral-Order Jurisdiction To Hear This Appeal

Although "final decisions" under 28 U.S.C. § 1291 are typically those that terminate an action, the term also includes a "small class" of prejudgment orders that are "'collateral to' the merits . . . and 'too important' to be denied immediate review,'" and therefore "appropriately deemed 'final.'" *Mohawk*, 558 U.S. at 103 (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). This collateral-order doctrine is "equally applicable in both civil and criminal proceedings." *Abney v. United States*, 431 U.S. 651, 659 n.4 (1977).

This Court has acknowledged that "[t]he line between those orders that are and are not appealable as collateral orders probably owes more to history than to precise logical consistency." *Abelesz v. OTP Bank*, 692 F.3d 638, 650 (7th Cir. 2012). And it has allowed collateral-order appeals where (as here) a criminal case raises concerns about "comity with [a foreign sovereign's] courts." *United States v. Bokhari*, 757 F.3d 664, 669-70 (7th Cir. 2014); *United States v. Kashamu*, 656 F.3d 679, 681-82 (7th Cir. 2011). Each of the criteria for collateral-order review is satisfied here. *See Swint*, 514 U.S. at 41-42.

### A.     The order conclusively determines the issue of service

The District Court's order "conclusively" determines the service issue, holding that "the motion to quash the government's service of summons of the criminal complaint and indictment filed by defendant Sinovel . . . is DENIED" and stating that "no further showing need be made to support this court's exercise of jurisdiction over defendant." A-6. The order thus constitutes a "complete, formal,

18

and, in the trial court, final rejection" of Sinovel's motion to quash. *Abney*, 431 U.S. at 659. "There are simply no further steps that can be taken in the District Court" for Sinovel to avoid trial based on the Government's failure to comply with Rule 4. *See id*. The government has not suggested otherwise.

### B.    <u>The service question is separate from the merits</u>

Adequacy of service is "completely collateral to the cause of action asserted." *Abney*, 431 U.S. at 658. The indictment alleges that Sinovel and others conspired to commit theft of trade secrets and criminal copyright infringement, and engaged in theft of trade secrets and wire fraud. In this appeal, by contrast, Sinovel argues that Criminal Rule 4 forecloses alter-ego service; that the District Court misinterpreted Delaware veil-piercing law; and that the government has not met its burden to pierce the corporate veil.

These questions are unrelated to the merits. Two of them (i.e., the meaning of Rule 4 and the elements of veil-piercing) are pure issues of law that plainly do not overlap with the merits. The relationship between Sinovel and its U.S. subsidiary— relevant to piercing the corporate veil—is also unrelated to the criminal allegations. The indictment does not allege that Sinovel controlled its U.S. subsidiary in any sense relevant to the alleged crimes. In fact, the indictment alleges no specific action by Sinovel USA related to the alleged offenses. *See* A-37 to -47. Again, the government does not suggest otherwise.

19

**C.    The service question is not practically reviewable on appeal from final judgment**

Whether a right is "adequately vindicable" or "effectively reviewable" after final judgment depends on "the value of the interests that would be lost through rigorous application of a final judgment requirement." *Mohawk*, 558 U.S. at 107 (quotation omitted). Immediate appeal is justified if delaying review "would imperil a substantial public interest" or "some particular value of a high order," *Will v. Hallock*, 546 U.S. 345, 352-53 (2006), if "appellate review must occur before trial to be fully effective," *Flanagan v. United States*, 465 U.S. 259, 266 (1984), or where the issue is "too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated," *Montaño v. City of Chi.*, 375 F.3d 593, 598 (7th Cir. 2004). Those standards are satisfied here for several reasons.

***First***, immediate appeal would advance the "particular value of a high order," *Will*, 546 U.S. at 352-53, of safeguarding "the comity or mutual respect that is essential in dealings between sovereign nations." *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 667 (7th Cir. 2012) (citing, *e.g.*, *Republic of Philippines v. Pimentel*, 553 U.S. 851, 865 (2008)). Those concerns are implicated here, not only because Sinovel is partially owned by a foreign government, but also because the subject-matter of this case implicates longstanding diplomatic tensions over state-sponsored cybercrimes. *See supra* pp. 9-11; *infra* Part II.C.3.

That prosecutors may perceive no threat to foreign relations does not remedy the concern. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561

20

U.S. 477, 497 (2010) ("[T]he separation of powers does not depend on . . . whether 'the encroached-upon branch approves the encroachment'" (citation omitted)).  As other courts have concluded, where a defendant raises even an "arguabl[e]" claim that the government's actions had "violat[ed] a treaty with a foreign nation, foreign policy concerns might militate in favor of immediate appeal."  *United States v. Sorren*, 605 F.2d 1211, 1214 (1st Cir. 1979).  Prosecutors here have not even attempted to invoke the longstanding formal agreement between China and the United States governing mutual assistance in criminal matters, including service of process.  *See infra* Part IV.C.

*Second*, as a partially state-owned entity, Sinovel has the right (absent being formally brought within a court's jurisdiction) to "avoid litigation in another sovereign's courts."  *Pullman Constr. Indus., Inc. v. United States*, 23 F.3d 1166, 1168 (7th Cir. 1994) (discussing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993)).  An immediate appeal would avert the "indignity of subjecting a [foreign] State to the coercive process of judicial tribunals."  *Puerto Rico Aqueduct*, 506 U.S. at 146.  The continued exercise of criminal jurisdiction inflicts injury not remedied by final-judgment appeal, given the "embarrassment, expense and ordeal" (*Abney*, 431 U.S. at 661-62) for both Sinovel and its sovereign (partial) owner.  If protecting the "dignitary interests" of a U.S. state justifies immediate appeal, *see Puerto Rico Aqueduct*, 506 U.S. at 146, a fortiori immediate appeal should be available to safeguard the property interests of a foreign nation.

This Court has exercised collateral-order jurisdiction to vindicate laws protecting other "foreign-state property" against judicial attachment. *See Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 785, 790 (7th Cir. 2011) ("two collections of Persian antiquities"); *accord Segni v. Commercial Office of Spain*, 816 F.2d 344 (7th Cir. 1987); *see also Ex Parte Republic of Peru*, 318 U.S. 578 (1943) (issuing writ of mandamus to prevent continued exercise of jurisdiction over a case involving a foreign nation's property, several years before *Cohen* recognized mechanism for direct appellate review). Other courts have entertained a collateral-order appeal in civil cases where a foreign sovereign defendant alleged deficient service of process. *See, e.g.*, *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 149-50 (D.C. Cir. 1994).

**Third**, an immediate appeal could prevent these criminal proceedings from interfering with ongoing civil litigation in Chinese courts, pending since 2011. *See supra* p. 9. This Court has repeatedly exercised collateral-order jurisdiction to review a claim based on "comity with [a foreign sovereign's] courts." *Bokhari*, 757 F.3d at 669-70; *Kashamu*, 656 F.3d at 681-82. Similar to concerns of preclusion and collateral estoppel, comity concerns are inevitable if both U.S. and Chinese courts move forward simultaneously in adjudicating what is ultimately a single set of underlying facts about Sinovel's use of AMSC software.

**Fourth**, this Court has recognized that a transnational criminal prosecution can cause injuries not remediable on final-judgment appeal. In *Bokhari*, as here, the defendant resided in a foreign country and could not be extradited. This Court

22

recognized harm to the foreign defendant from an "inability to travel," "the overhanging threat of extradition, and the prospect of the trial that would inevitably follow." 757 F.3d at 669-70; *accord Kashamu*, 656 F.3d at 682 (same); *see also In re Hijazi*, 589 F.3d 401, 407 (7th Cir. 2009) (granting writ of mandamus based on similar injury to foreign criminal defendant).

The possibility that a foreign defendant might appeal after appearing in a U.S. court and litigating to final judgment does not bar collateral-order review:  a defendant should not be forced to "give up his right not to return (or to resist extradition) to this country." *Bokhari*, 757 F.3d at 670.  If a foreign defendant were to appear voluntarily, he would "be unable to use the comity argument to avoid trial"—a source of irreparable injury even if prosecuting a defendant who *did appear* in the United States "would certainly not offend [the foreign country]." *Id.* Sinovel suffers similar ongoing harm from the threat that its officers or employees traveling internationally will be detained or served with process by U.S. officials or those assisting them.  Moreover, "if [Sinovel appears and] is acquitted, there will be no appeal through which [it] might obtain review" of the service issue. *Sell v. United States*, 539 U.S. 166, 177 (2003).

**Fifth,** an immediate appeal would ensure that federal law—including rules governing service of process—does not extend extraterritorially "unless a contrary intent appears" clearly from its text. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).  The presumption against extraterritoriality "protect[s] against unintended clashes" with foreign law, *id.*, by ensuring that Congress has given its

considered judgment to the implications of foreign application of federal law. *See* Einer Elhauge, *Statutory Default Rules: How to Interpret Unclear Legislation* 205-06 (2008). Congress, not the executive branch, is responsible in the first instance for ensuring that the application of U.S. law to foreign entities does not interfere with foreign relations. *Cf. Arabian Am. Oil Co.*, 499 U.S. at 256 ("[H]ad Congress intended Title VII to apply overseas, it would have addressed the subject of conflicts with foreign laws and procedures."). Criminal Rule 4, which was promulgated subject to Congressional review and approval, *see* 28 U.S.C. § 2074, was drawn narrowly to require a clear and definite presence in the United States to effectuate service.[6]

**Finally**, the class of orders at issue here presents no "floodgates" concern presented where "nothing about the circumstances" of a particular claim will "inherently limit[] the availability of the claim." *MacDonald*, 435 U.S. at 862. Prosecutors have only rarely invoked an alter-ego theory of criminal service, and have done so less frequently in a case involving a partially state-owned foreign company. *See infra* Part II.C.2 (discussing the only six cases in U.S. history in which the government has raised the issue, four of which rejected the government's position). Thus, there is little risk that entertaining this appeal would allow a claim to be raised "in every case." *MacDonald*, 435 U.S. at 862.

---

[6] These numerous concerns distinguish cases focusing on a "right not to be tried," *e.g.*, *United States v. MacDonald*, 435 U.S. 850, 861 (1978), or addressing objections to service or jurisdiction in *civil* matters, *e.g.*, *Van Cauwenberghe v. Biard*, 486 U.S. 517, 525 (1988).

**D.**   **Mandamus is an alternate basis for jurisdiction**

If this Court concludes it has collateral-order jurisdiction, it is "unnecessary" (*Bokhari*, 757 F.3d at 671) to resolve Sinovel's mandamus petition.  But this Court plainly has jurisdiction, under 28 U.S.C. § 1651, to issue a writ of mandamus.  *OTP Bank*, 692 F.3d at 651.  Mandamus relief is appropriate for all the reasons set forth below and in Sinovel's mandamus briefing, which this Court consolidated with this appeal.  *See* Order (Nov. 10, 2014).

**II.**   **The District Court's Alter-Ego Theory Is Inconsistent With Rule 4**

The District Court's most fundamental error was superseding the plain language, history, and purpose of Criminal Rule 4, with a judge-made alter-ego theory.  That theory lacks support in the Rule or cases interpreting it, and raises a host of practical and diplomatic concerns that fidelity to the Rule's plain text would avoid.

**A.**   **The government did not comply with Rule 4's two explicit requirements for service of process**

Criminal Rule 4 establishes two unambiguous requirements for service on an organization.  The government:

> (1) must "*deliver*[] a copy [of the summons] to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process"; and

> (2) "must also . . . *mail*[] [the summons] to the organization's last known address within the district" or the defendant's "principal place of business elsewhere in the United States."

Fed. R. Crim. P. 4(c)(3)(C) (emphasis added).  These requirements are a mandatory prerequisite "to any procedural imposition on [a corporate defendant]."  *See Murphy*

*Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999); 4 Wright & Miller, *supra*, § 1063 ("[A]n action . . . cannot proceed unless valid service on the defendant is effected."). The government satisfied neither.

### 1. The government did not "deliver[]" the summonses to Sinovel

The government sent copies of a summons to the corporate registered agent for, and former Houston office address of, Sinovel USA. Doc. 36 at 1-2. But neither Sinovel USA nor its Delaware or Texas registered agents is an "officer," "managing or general agent" of Sinovel, or agent otherwise authorized to accept service of process on Sinovel. Doc. 54 ¶ 11. The government has never suggested otherwise. It is hornbook law that, absent unusual circumstances not present here, service on a subsidiary is not effective as service on the parent corporation. *See, e.g.*, *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 n.* (1988); *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336-37 (1925); *see also Bestfoods*, 524 U.S. at 61-62.

### 2. The government did not "mail[]" the summonses to Sinovel

The government sent Federal Express packages (containing various versions of a summons) to Sinovel USA's Houston office address and Sinovel USA's registered agent for service of process in Texas and Delaware. *See* Doc. 36 at 1-2. But by its plain terms, Rule 4's mailing requirement explicitly requires mailing to "the *organization's* last known address," and does not contemplate mailing to any entity other than the named defendant—whether or not that entity is an "agent" of the entity to be served. In this respect, the mailing requirement differs materially

26

from the "deliver[y]" requirement, which allows service through an "agent." Fed. R. Crim. P. 4(c)(3)(C); *see also Johnson Matthey*, 2007 WL 2254676, at *2 (quashing criminal service, despite government's mailing of summons to foreign defendant's U.S. subsidiary, because defendant itself had "not been shown to be present in the District of Utah" and had no address or principal place of business there). Sinovel itself does not have, and never has had, an address in the Western District of Wisconsin. Doc. 54 ¶ 4. Nor does it have a principal place of business elsewhere in the United States. Rather, its principal place of business is, and always has been, in China. *Id.* ¶ 5; *see Hertz Corp. v. Friend*, 559 U.S. 77, 79-81, 92-93 (2010) (corporation's "principal place of business" refers to its "nerve center"—"the place where a corporation's officers direct, control, and coordinate the corporation's activities").[7]

### B.    **The Rule's context and drafting history confirm its mandatory nature**

Interpretation of Rule 4 "depends upon reading the whole . . . text, considering the [Rule's] purpose and context . . . , and consulting any precedents or

---

[7] Below, the government invited the District Court to treat the mailing requirement as mandatory but not "jurisdictional." Doc. 72 at 2-3. The government did not explain why a court could overlook a "mandatory" requirement despite Sinovel's timely objection. *Cf. Eberhart v. United States*, 546 U.S. 12, 18 (2005) (discussing non-jurisdictional claim-processing rule, for which "court's duty to dismiss" is "mandatory" where a party timely objects). Magistrate Judge Crocker questioned whether the government had preserved this argument (see Doc. 68 at 12 n.3 ("not developed")) and declined to address it. The District Court ignored the issue, but did not explain how the mailing requirement was satisfied here. *But see Fink v. Igoe*, 279 F.2d 544, 546 (7th Cir. 1960) (quashing service in a civil case where the defendant "d[id] not reside and d[id] not have a regular and established place of business in the . . . [d]istrict").

authorities that inform the analysis." *United States v. Hagler*, 700 F.3d 1091, 1097 (7th Cir. 2012). "Surrounding sentences are context for interpreting a sentence, but so is the history behind the sentence—where the sentence came from, [and] what problem it was written to solve." *Sundstrand Corp. v. Commissioner*, 17 F.3d 965, 967 (7th Cir. 1994). The federal rules addressing service of process, viewed as a whole, combined with Criminal Rule 4's purpose and history, confirm that its service requirements are mandatory.

### 1.    The Civil Rule's explicit authorization of extraterritorial service contrasts with Criminal Rule 4's domestic scope

Criminal Rule 4's civil counterpart uses precisely the kind of express language—missing from the criminal rule—that might support the District Court's reading. Civil Rule 4 addresses service on a corporation "at a place not within . . . the United States," Fed. R. Civ. P. 4(h), and authorizes various mechanisms, including by "any internationally agreed means of service that is reasonably calculated to give notice," *id.* 4(f)(1). Civil Rule 4 takes account of the sensitive diplomatic concerns raised by extraterritorial service (ignored by the District Court here), and explicitly avoids conflicts with the domestic law of other nations. *See id.* 4(f)(2) (authorizing means "prescribed by the foreign country's law" or not "prohibited" by it). And unlike the criminal rule, Civil Rule 4 provides some textual foundation for a judge-made alter-ego theory, expressly authorizing service on a foreign organization by a means "not prohibited by international agreement, *as the court orders*." *Id.* 4(f)(3).

Like the civil rule's framers, Congress has acted explicitly when it intended to authorize service abroad. Under Section 12 of the Clayton Act, for instance, "process in [an antitrust action] may be served . . . wherever [a corporation] may be found." 15 U.S.C. § 22. In civil cases, some courts have read Section 12 to authorize "worldwide[] service of process." *E.g.*, *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 293 (3d Cir. 2004).[8]

The sharp textual distinctions between Criminal Rule 4, the civil rules, and statutes authorizing extraterritorial service, demonstrate that the rulemakers "act[ed] intentionally and purposely" (*Bates v. United States*, 522 U.S. 23, 29-30 (1997)) in adopting more exacting procedures for criminal service. With good reason. "[C]riminal jurisdiction over activity with substantial foreign elements *should be exercised more sparingly* than civil jurisdiction over the same activity, and only with strong justification." *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 185 n.17 (3d Cir. 1995) (emphasis added); *accord United States v. Bowman*, 260 U.S. 94, 97-98 (1922) (strong presumption against extraterritoriality for criminal statutes). Even if a district court can exercise *civil* jurisdiction over a foreign defendant based on an alter-ego theory, "the presence of substantial foreign elements will ordinarily weigh against application of criminal law," Restatement (Third) of Foreign Relations Law § 403 cmt. f (1987).

---

[8] Even still, courts have expressed doubt about whether Section 12 applies at all to criminal proceedings, underscoring the novelty and breadth of the District Court's decision here. *See, e.g.*, *United States v. Nippon Paper Indus. Co.*, 944 F. Supp. 55, 61 (D. Mass. 1996), *rev'd on other grounds*, 109 F.3d 1 (1st Cir. 1997).

The government's only textual argument to the contrary is that Sinovel and its U.S. subsidiary can be treated as "the same 'organization,'" as that word is used in Criminal Rule 4(c)(3)(C). Gov't Mandamus Resp. 8. But Rule 4 addresses service through an intermediary explicitly when it intends to allow it, and limits the kinds of proxies that qualify. *See* Fed. R. Crim. P. 4(c)(3)(C) (service on "managing or general agent" or "other agent appointed or legally authorized to receive service"). The government's reading gives short shrift to the Rule's enumeration of qualifying "agents," and would improperly expand the narrow class of potential proxies ("managing," "general," "appointed," "legally authorized") to an (indeterminate) group of entities viewed, after the fact and based on no particular criteria, as an "alter ego." *Cf. United States v. Michalek*, 54 F.3d 325, 335-36 (7th Cir. 1995) (court must "mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same [text] inconsistent, meaningless or superfluous").

## 2.   Rule 4's history does not support service on a foreign defendant through a domestic subsidiary

Although the inquiry can end with Rule 4's plain language, the rulemaking history further undermines the District Court's alter-ego theory. Longstanding historical practice limited service of a civil summons to the district where a case was filed. *See* Holtzoff, *supra*, 1063-64. Although the first Civil Rules authorized service within the forum state, they allowed service beyond those "territorial limits" only "when a statute of the United States so provides." Fed. R. Civ. P. 4(f) (1939) (reproduced in Mandamus App. A-54).

From their inception, the criminal rules have taken a narrower approach. The initial 1946 rule imposed "[t]erritorial [l]imits" on service of a summons, stating that "[t]he warrant may be executed or the summons may be served at any place *within* the jurisdiction of the United States." Fed. R. Crim. P. 4 (c)(2) (1946) (reproduced in Mandamus App. A-56); *see also id.* 9(c)(1). In this respect, the criminal rule remains unchanged today, authorizing service either "within the jurisdiction of the United States" or in places where "a federal statute authorizes an arrest." Fed. R. Crim. P. 4(c)(2) (discussing "[l]ocation" of service). The "lack of historical precedent" for the government's current veil-piercing theory is a strong indication of its invalidity. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2586 (2012) ("telling indication" of a "severe" problem).

### 3. Ongoing efforts to amend Criminal Rule 4 underscore the lack of support for the District Court's theory

Although the government now claims that its efforts at service comply with Rule 4, it has made different representations for the past two years in seeking to amend that rule. After a high-profile string of losses in criminal-service disputes, *see supra* n.5, the head of DOJ's Criminal Division formally requested amendments to Rule 4(c)(3)(C) "to permit the effective service of a summons on a foreign organization that has no agent or principal place of business within the United States." Doc. 51-2 at 1. In DOJ's words, the amendment was "*necessary*," because "Rule 4 can be and has been read to preclude jurisdiction in criminal cases" against foreign organizations that lack a U.S. agent or address. *Id.* at 1, 5 (emphasis added).

DOJ proposed repealing Rule 4(c)(3)(C)'s mailing requirement outright, and expanding Rule 4(c) to include five new means of service "at a place not within a judicial district of the United States." *Id.* at 1, 6-8. Under the amendments, a criminal summons could be served "in a manner authorized under the laws of the foreign jurisdiction," or "by other means reasonably calculated to give notice," such as "a letter rogatory or letter of request," or by "other means . . . , as the court orders." *Id.* at 7.

A subcommittee agreed and acknowledged that Rule 4's mailing requirement is currently a "major impediment" to serving foreign organizations. Subcommittee Memorandum, *supra*, 3-4. The subcommittee candidly acknowledged that under Rule 4's current meaning:

> *in every case* involving an organizational defendant . . . *it is not possible to serve a foreign entity* – even one that conducts both real and virtual business within the United States – that has neither a principal place of business nor a known address within the district of prosecution.

*Id.* at 4 (emphasis added).

The full Rules Committee proposed formal amendments in August 2014. It also recognized Rule 4's current text as an "impediment" to prosecuting foreign organizations, and proposed means of service "authorized by the foreign jurisdiction's law" or "permitted by an applicable international agreement." Proposed Amendments, *supra*, 321, 333-34; *see also id.* committee's note at 337 (citing mutual legal assistance treaty as example). Tellingly, even the proposed new service methods are still fundamentally different than an alter-ego theory. *See id.* at 333-34 (authorizing service through means "stipulated by the parties,"

"undertaken by a foreign authority in response to a letter rogatory," or "permitted by an applicable international agreement"); *cf. Norfolk & W. Ry. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991) ("when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.").

Given its fervent efforts to amend Rule 4, it is incredible for the government to claim that the existing rule authorizes the result here. And the likelihood that new amendments will govern future service confirms there is no need for judicial rewriting of Rule 4. Assuming no changes are made, the amendments will take effect in December 2016. The District Court short-circuited this ongoing, congressionally-sanctioned amendment process.

### C. <u>The civil alter-ego doctrine does not excuse non-compliance with the Rule</u>

In rejecting Sinovel's straightforward textual argument to quash service, the District Court concluded that an alter-ego theory occasionally applied in determining personal jurisdiction in civil cases—under the "minimum contacts" analysis of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945); *see also* Doc. 77 at 17-21 (government brief citing to "minimum contacts" cases)—should be grafted onto the distinct requirements for service under Criminal Rule 4. That was error.

### 1. An alter-ego theory developed for civil personal jurisdiction is not appropriate for service of criminal process

Personal jurisdiction over a subsidiary corporation typically does not establish jurisdiction over a parent. *See, e.g.*, *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 n.\* (1988); *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336-37 (1925); *see also Bestfoods*, 524 U.S. at 61-62. As a narrow exception, courts in civil cases have sometimes pierced the corporate veil when the parent-subsidiary separation is a fiction, imputing a subsidiary's forum contacts and actions to the parent for purposes of "minimum contacts." *See generally* 4A Wright & Miller, *supra*, § 1069.4.

But the Supreme Court has underscored that the "essential purpose" of service requirements is "distinct from" personal jurisdiction. *Henderson v. United States*, 517 U.S. 654, 671-72 & n.20 (1996) ("Service of process . . . is properly regarded as a matter discrete from a court's jurisdiction . . . over persons."). The federal rules reflect this distinction. Civil Rule 12(b) lists "lack of personal jurisdiction" as a separate defense from "insufficient service of process." *Compare* Fed. R. Civ. P. 12(b)(2), *with id.* (b)(5). "Jurisdiction (amenability to service of process) and service (validity of the service of process) are separate matters," because "[t]he problems presented by service typically involve statutory matters," such that "[s]atisfying the constitutional requirement [for personal jurisdiction] is not enough." 1 Philip I. Blumberg et al., *Blumberg on Corporate Groups* § 36.01 (2d ed. 2005). As even the government concedes, "[t]he issue of 'minimum contacts' does not arise in criminal cases." Gov't Mandamus Resp. 12 n.10. By importing the

alter-ego analysis into Criminal Rule 4, the District Court's decision collapses this "important" doctrinal distinction.  4 Wright & Miller, *supra*, § 1063.

> ## 2.     The District Court relied on two distinguishable, outlier cases

Without elaboration, the District Court said it was "not persuaded" by the distinction between civil personal jurisdiction and criminal service, A-5, despite the Magistrate Judge's recognition that "[n]o federal court of appeals and no court in this district has [previously] adopted the [civil] alter ego doctrine in a criminal service case," A-22 (citing *Alfred L. Wolff*, 2011 WL 4471383, at *4).  The District Court acknowledged that the "majority" of cases have rejected—sometimes repeatedly—attempts to serve a parent through its subsidiary in a criminal case.  A-3; *see Kolon Indus.*, 926 F. Supp. 2d at 814 (quashing criminal service on Korean corporation); *Kolon* Order 1 (same, for additional service efforts); *Pangang Grp.*, 879 F. Supp. 2d at 1066 (quashing criminal service on Chinese corporation); *Pangang* Order 11 (same, for additional service efforts); *Alfred L. Wolff*, 2011 WL 4471383, at *7-8 (quashing criminal service on German and Chinese corporations); *Johnson Matthey*, 2007 WL 2254676 (quashing criminal service on English corporation).[9] But the District Court departed from that authority and relied on the only two decisions in U.S. history that authorized alter-ego service in a criminal prosecution.

---

[9]  The District Court read *Kolon*, *Pangang*, and *Johnson Matthey* as "acknowledg[ing]" that service on a subsidiary could be effective as to a parent.  A-3. But in each case, the government's failure to prove alter-ego status made it unnecessary for the courts to reach the broader question.

*See* A-4 to -5 (citing *Pub. Warehousing*, 2011 WL 1126333; *Chitron*, 668 F. Supp. 2d 298).

Neither of those cases supports adopting an alter-ego theory here. *Chitron* acknowledged Rule 4's mandatory nature and that "service of process on a wholly owned subsidiary does not constitute service . . . on the parent corporation." *Id.* at 304-05. But the court quoted *Stanley Works v. Globemaster, Inc.*, 400 F. Supp. 1325 (D. Mass. 1975), a civil case, for the proposition that service on a "'foreign parent'" can be effected where a "'local subsidiary'" has minimum contacts and is a "'mere conduit'" for its parent's activities. *Chitron*, 668 F. Supp. 2d at 305.[10]    As Magistrate Judge Crocker acknowledged, however, *Chitron* "did not cite any authority" supporting its holding on criminal service. A-22.

*Public Warehousing* relies almost exclusively on *Chitron*, without any further rationale or authority. *See* 2011 WL 1126333, at *6-7.    The case also takes a particularly aggressive approach to veil-piercing—one with little foundation even in Eleventh Circuit law. *Compare* 2011 WL 1126333, at *5-6 (discussing only the parent's control of the subsidiary), *with United Steelworkers of Am. v. Connors Steel Co.*, 855 F.2d 1499, 1506-07 (11th Cir. 1988) (also requiring proof of fraud and proximate cause).

---

[10] *Chitron* failed to acknowledge, much less discuss, that *Globemaster* applied the broader requirements of Civil Rule 4, and invoked the "liberal test of service" for patent infringement cases, which by statute contemplates service "upon [a defendant's] agent or agents conducting [his] business [in the forum]." 400 F. Supp. at 1335 (citing 28 U.S.C. § 1694). And although *Chitron* cited the case as authority for service on a "foreign" defendant, the "foreign" parent there (in Massachusetts federal court) was "a Texas corporation, with its principal place of business in Houston." *Id.* at 1328.

The government's policy rejoinder—that without writing an alter-ego exception into Rule 4, courts will be relegated to applying their "own judgment" without any legal constraint (Gov't Mandamus Resp. 8-9)—strains credulity. The alternative to an atextual alter-ego theory is fidelity to the Rule's plain language, not unprincipled ad-hoc decisionmaking. And the government shows a profound disrespect for the corporate form when it claims that Rule 4 must be judicially rewritten to avoid "immuniz[ing]" from criminal liability organizations that "divide the group up on paper." *Id.* at 9. Abiding by a state's legal requirements to incorporate an entity, and then observing relevant corporate formalities in its operation and activities, are acts that courts do not lightly disregard for the government's convenience. *Id.*

### 3. The District Court ignored serious diplomatic consequences

The District Court's terse order also failed to address the "delicate foreign relations issues" (*In re Hijazi*, 589 F.3d at 411) raised by importing an alter-ego theory into Criminal Rule 4—thereby allowing service on a vast range of foreign companies that have a small U.S. subsidiary. Those concerns are well-illustrated by the facts here. The Chinese government owns nearly a quarter of Sinovel. Doc. 54 ¶ 3. Thus, allowing this case to proceed to arraignment and trial affects the "dignity and rights of a . . . sovereign state." *Ex Parte Republic of Peru*, 318 U.S. 578, 586-87, 590 (1943) (granting writ of mandamus to prevent exercise of jurisdiction over case affecting foreign nation's property).

Transnational prosecutions not infrequently implicate issues being (and perhaps best) addressed on the diplomatic stage. The subject matter of this prosecution—electronic theft of trade secrets—is the focus of long-brewing tensions between the United States and China over alleged state-sponsored cybercrimes. *See supra* n.3 (citing examples). The connection between that diplomatic issue and the criminal indictment here is anything but hypothetical: AMSC openly leveraged diplomatic tensions to encourage this prosecution, soliciting support from high-ranking U.S. officials. *See supra* pp. 9-11.

Similar diplomatic concerns have prompted this Court's intervention even through the extraordinary remedy of mandamus; a fortiori, the error can be corrected on direct appeal. *See Abelesz*, 692 F.3d at 651 (overturning the district court's exercise of jurisdiction over two Hungarian banks, and citing the "appreciable foreign policy consequences"); *see also In re Pet'n of Boehringer Ingelheim Pharm., Inc.*, 745 F.3d 216, 219 (7th Cir. 2014) (granting mandamus relief based in part on concern that a German company might "complain[] to the German government . . . that the judge's order . . . infringes German sovereignty").

## III.    The District Court Misapplied Controlling Delaware Law

The District Court independently erred by diluting the test for veil-piercing under Delaware law.[11]    Contrary to the dominant weight of Delaware cases, including decisions of the Delaware Supreme Court and Court of Chancery (which,

---

[11] The District Court correctly held (A-5 to -6) that "veil-piercing claims are governed by the law of the state of the corporation whose veil is sought to be pierced," *On Command Video Corp. v. Roti*, 705 F.3d 267, 272 (7th Cir. 2013)—here, Delaware.

under Delaware law, has exclusive responsibility for equitable issues such as veil-piercing), the District Court pierced Sinovel's corporate veil without any showing (or even allegation) that Sinovel used the corporate form to perpetrate fraud or similar injustice. *See* A-6. The District Court further erred when it adopted a vague substitute test: i.e., whether a subsidiary "has no independent reason for existence." *Id.* These errors provide an independent basis for reversal.

### A.    Delaware law requires fraud or similar injustice to pierce the corporate veil, even in "jurisdictional" cases

Under Delaware law, "[f]raud or something like it is required" to pierce the corporate veil. *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989); *accord Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("To state a 'veil-piercing claim,' the plaintiff *must plead* facts supporting an inference that the corporation, through its alter-ego, has created a sham entity *designed to defraud* investors and creditors." (emphasis added)). As Delaware's Court of Chancery explained just six weeks ago, veil-piercing "only applies when the use of 'the corporate form in and of itself operates *to serve some fraud or injustice*.'" *Theravectys SA v. Immune Design Corp.*, No. C.A. No. 9950–VCN, 2014 WL 5500506, at *2 (Del. Ch. Oct. 31, 2014) (emphasis added; quoting *Medi–Tec of Egypt Corp. v. Bausch & Lomb Surgical*, No. Civ. A. 19760, 2004 WL 415251, at *4 (Del. Ch. Mar. 4, 2004)).[12]

---

[12] Unpublished Delaware decisions are precedential and entitled to "great deference" on issues of Delaware law. *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1207 (Del. Ch. 1987); *see Case Financial, Inc. v. Alden*, No. 1184-VCP, 2009 WL 2581873, at *6 n.39 (Del. Ch. Aug. 21, 2009).

The District Court did not dispute that Delaware law requires proof of fraud or similar injustice to pierce the veil.[13] Instead, the court distinguished between veil-piercing for substantive liability (for which fraud is required) and veil-piecing for jurisdictional purposes (for which, in the District Court's erroneous view, fraud is not required). *See* A-6. That distinction, however, conflicts with the great weight of Delaware precedent. As recently as 2011, the Court of Chancery held in rejecting a jurisdictional veil-piercing claim—*not* a substantive-liability claim—that showing fraud was required to pierce the veil: "[T]he Court will ignore the sanctuary of the corporate form *to assert jurisdiction* over a nonresident . . . entity . . . *only in the exceptional case* where the complainant can show *fraud, injustice or inequity* in the use of the corporate form." *Reid v. Siniscalchi,* No. 2874-VCN, 2011 WL 378795, at *11 (Del. Ch. Jan. 31, 2011) (emphasis added); *see also Ruggiero v. FuturaGene, plc*, 948 A.2d 1124, 1135 n.27 (Del. Ch. 2008) (citing *HMG/Courtland Prop., Inc. v. Gray*, 729 A.2d 300, 307 (Del. Ch. 1999)) (noting that Delaware courts apply alter-ego "strictly," even in jurisdictional cases).

*Reid* is no outlier. Delaware courts have repeatedly confirmed that veil-piercing requires a showing of fraud in the jurisdictional context, no less than for substantive liability. Such cases are legion. For example, the Court of Chancery, in

---

[13] Although some older Delaware decisions have articulated the test in slightly different terms, they uniformly require a heightened showing beyond what the District Court contemplated here. *See Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968) (referring in dicta to "such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it," but ultimately refusing to pierce the veil where "[t]here [wa]s no showing whatsoever . . . of fraud or other elements which would authorize the disregard of the separate corporate entities").

determining whether a defendant "*would be subject to personal jurisdiction* under the alter ego theory," held that the plaintiff had "failed to meet its burden of pleading *the fraud element of alter ego jurisdiction.*"  *EBG Holdings LLC v. Vredezicht's Gravenhage 109 BV*, Civ. A. No. 3184-VCP, 2008 WL 4057745, at *12 & n.103 (Del. Ch. Sept. 2, 2008) (emphasis added); *accord Sprint Nextel Corp. v. iPCS, Inc.*, Civ. A. No. 3746, 2008 WL 2737409 (Del. Ch. July 14, 2008).  To similar effect, an earlier Chancery Court decision held that the plaintiff had "failed to allege sufficiently even a prima facie case that this Court has *jurisdiction over [the defendant] under the alter-ego theory*," because it did not prove "*fraud, injustice, or inequity* in the use of the corporate form."  *Fitzgerald v. Cantor*, No. C.A. 16297-NC, 1998 WL 842316, at *2 (Del. Ch. Nov. 10, 1998) (emphasis added).  The same court "dismiss[ed] [a] complaint *for lack of jurisdiction* over the person," because "*[i]n the absence of fraud*, the separate entity of a corporation is to be recognized."  *Terry Apartments Assocs. v. Associated-East Mortg. Co.*, 373 A.2d 585, 588-89 (Del. Ch. 1977) (emphasis added).  The requirement of fraud, the court explained, "'has been enunciated by all of the courts of this state.'"  *Id.* (quoting *Pauley Petroleum, Inc. v. Continental Oil Co.*, 231 A.2d 450 (Del. Ch. 1967), *aff'd*, 239 A.2d 629 (Del. 1968)).

Lower Delaware courts have taken the same approach.  In 1995, the Delaware Superior Court examined whether a defendant "*may be subject to personal jurisdiction* in Delaware under an alter ego theory."  The court explained that this theory allows courts to "ignore the corporate boundaries between parent and subsidiary *where fraud or inequity* in the use of the corporate form is shown."

*Chaplake Holdings, Ltd. v. Chrysler Corp.*, Civ. A. No. 94C-04-164, 1995 WL 653510, at *4 (Del. Super. Ct. Aug. 11, 1995) (emphasis added). To similar effect, *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 727-29 (Del. Super. Ct. 1996), addressed whether the court could exercise personal jurisdiction over a foreign parent through its Delaware subsidiary. "[T]he alter ego theory *requires* that the corporate structure cause fraud or similar injustice," and injustice "must be more than the [underlying claim] alleged in the complaint." *Id.* at 729 (emphasis added). Because the plaintiff had not alleged that the parent and its subsidiary were "abusing the corporate form *to effect a fraud*," the veil remained intact. *Id.* (emphasis added).[14]

### B. The District Court erroneously relied on dicta from one trial-court decision

The District Court's half-page analysis addressed none of these cases, relying instead on a single decision from a trial court *that lacks jurisdiction* to pierce the

---

[14] Federal courts applying Delaware law agree. "Under the alter ego or piercing the corporate veil doctrine, courts will ignore the corporate boundaries between parent and subsidiary *if fraud or inequity is shown.*" *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1463 (D. Del. 1991) (emphasis added); *see also Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1304 (D. Del. 1990) (for purposes of jurisdiction, "to reach a parent corporation under the alter-ego theory, the plaintiff *must show fraud, injustice, or inequity in the use of the corporate form*" (emphasis added)). Moreover, in declining to pierce the veil specifically in the context of Criminal Rule 4, federal courts have applied the veil-piercing standard for substantive liability, without mention of any distinction for jurisdictional issues. *See, e.g., Alfred L. Wolff*, 2011 WL 4471383, at *5 (applying Delaware veil-piercing cases involving substantive liability, and observing that Delaware law requires proof that a corporation was "created" or "used" with "fraud or unfairness"); *Pangang Grp.*, 879 F. Supp. 2d at 1066 (applying test from Ninth Circuit and New Jersey law, and citing New Jersey case involving substantive liability for environmental cleanup based on alter-ego theory); *Kolon*, 926 F. Supp. 2d at 815 (citing same New Jersey case for veil-piercing standard).

veil.  *See* A-6 (citing *Zhai*, 2012 WL 1409358, at *7).  *But cf. Rodman Indus., Inc. v. G&S Mill, Inc.*, 145 F.3d 940, 943 (7th Cir. 1998) (in diversity, federal court must "predict how the [State] Supreme Court would decide the issues").  For its part, the government summarily asserts—without citation—that "[m]ost recent Delaware opinions" do not require fraud to pierce the veil "for jurisdictional purposes."  Gov't Mandamus Resp. 23-24.  That is simply wrong, as the cases discussed above illustrate.

The District Court erred by relying on *Zhai* to chart a new path in Delaware veil-piercing jurisprudence.  For one thing, *Zhai* was a trial-court decision from the Delaware *Superior* Court,[15] not the Court of Chancery or Supreme Court.  Under Delaware law, the Superior Court *lacks jurisdiction* to pierce the veil;  "'piercing the corporate veil may be done *only* in the Court of Chancery.'"  *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 452 n.35 (Del. 2013) (emphasis added) (quoting *Sonne v. Sacks*, 314 A.2d 194, 197 (Del. 1973)).  The Chancery Court's exclusive domain over veil-piercing extends to "jurisdictional" issues.  *See Ali v. Beechcraft Corp.*, C.A. No. N11C–12–253 FSS, 2014 WL 3706619, at *3 (Del. Super. Ct. June 30, 2014).

Moreover, *Zhai* was not a veil-piercing case.  Nor did it involve jurisdiction or service.  *Zhai* concerned whether to dismiss a lawsuit for failure to state legally cognizable tort claims.  2012 WL 1409358, at *1, *6.  The defendants did not move

---

[15] Superior Court decisions are "not binding" on the Delaware Supreme Court.  *Glisson v. Glisson*, 237 A.2d 393, 395 (Del. 1967); *see also Martin v. Sand*, 444 A.2d 309, 314 (Del. Fam. Ct. 1982) ("[T]he Superior Court is not a court of last resort whose decisions are binding precedents").

to dismiss the case for lack of personal jurisdiction, *see id.*, and the issue of personal jurisdiction was not before the court.[16]

In a few sentences of dicta, *Zhai* articulated a muddied view of veil piercing, apparently because the *pro se* plaintiff there had presented a disjointed argument "without any legal theory cited." *Id.* at *7. The court noted that the plaintiff had waived any veil-piercing argument by "fail[ing] to offer any authority," and that "piercing the corporate veil may only be accomplished in the Court of Chancery" in any event. *Id.* *Zhai*'s discussion of veil-piercing was evidently developed without the benefit of adversarial testing by counsel, as the plaintiff was *pro se*. *See id.*; *cf. Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated."). And, so far as appears, *Zhai* has *never* been cited by any court (Delaware or otherwise) for the proposition invoked by the District Court here. *Zhai* is too slender a reed on which to depart from the great weight of Delaware authority.[17]

---

[16] Delaware courts do not address personal jurisdiction sua sponte. *See Plummer v. Sherman*, 861 A.2d 1238, 1243-44 (Del. 2004).

[17] The government has cited other Delaware cases beyond *Zhai*. *See* Gov't Mandamus Resp. 25-26. As Sinovel explained, none supports the government's position. *See* Sinovel Mandamus Reply 3-5. In fact, *Medi-Tec* does exactly the opposite, explicitly *requiring* a showing of fraud for a "jurisdictional" alter-ego analysis. *See* 2004 WL 5366102, at *3-4 (holding, under the heading "Alter Ego *Jurisdiction*," that the plaintiff's alter-ego argument "fails *because* it has not alleged that the corporate form in and of itself operates to serve *some fraud or injustice*" (emphasis added)). The government's other favored case, *Maloney-Refaie v. Bridge at School, Inc.*, declined to pierce the veil because "nothing suggest[ed]" that the defendant had "used [the] corporate form to perpetrate a fraud." 958 A.2d 871, 881 (Del. Ch. 2008).

**C.   The government has not shown, or even alleged, that Sinovel used the corporate form to perpetrate fraud or injustice**

The government has never alleged (much less sought to prove) that Sinovel used the corporate form to perpetrate fraud or similar injustice. The government's entire case therefore depends on the flatly incorrect proposition that Delaware law does not require fraud to pierce the veil for "jurisdictional" purposes. If this Court disagrees, the government unquestionably failed to carry its burden to pierce the corporate veil, and the decision below must be reversed.

**D.   Alternatively, this Court could certify the veil-piercing question to the Delaware Supreme Court**

Sinovel's position on appeal is that Delaware veil-piercing law is clear, and this Court should reverse without further guidance from Delaware courts. But in the unlikely event this Court is "genuinely uncertain," *Craig v. FedEx Ground Package Sys., Inc.*, 686 F.3d 423, 429 (7th Cir. 2012), about the question presented here—i.e., whether fraud or injustice in the use of the corporate form is required to pierce the veil for purposes of service of process under Delaware law—it can certify that question to the Delaware Supreme Court. *See* 7th Cir. R. 52(a); Del. Sup. Ct. R. 41(a)(ii) (authorizing a "Court of Appeals of the United States . . . on motion or *sua sponte*, [to] certify to this Court for decision a question or questions of law . . . if there is an important and urgent reason for an immediate determination of such question or questions by this Court").

This case is "appropriate" for certification. *See Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 514 F.3d 651, 659 (7th Cir. 2008). Given Delaware's dominant role in U.S. corporate law and the disproportionate number of U.S. companies incorporated

45

there (but operating nationwide), the veil-piercing standard is "'a matter of vital public concern,'" *id.* When read against the decisions cited above, *Zhai* could be (incorrectly) interpreted as evidence of "conflicting" "decisions of the trial courts." Del. Sup. Ct. R. 41(b)(ii); *see also id.* 41(b)(iii). The confusion reflected in the District Court's decision, and the diplomatic sensitivities involved in prosecuting partially state-owned foreign corporations, are "important and urgent reason[s] for immediate determination" of the issue. Del. Sup. Ct. R. 41(a)(ii).

Further, the issue may well "recur." *Plastics Eng'g*, 514 F.3d at 659. The Department of Justice has sought to amend Criminal Rule 4 based on an asserted "new reality" of a "global" economy, and "a growing class of organizations, particularly foreign corporations" invoking Rule 4's protections in "criminal proceedings." Doc. 51-2 at 2-3. And because the government has not alleged or sought to prove fraud or similar injustice, "resolution of the question to be certified is outcome determinative" on service—and potentially the case as a whole. *Craig*, 686 F.3d at 430. Nor is the question "tied to the specific facts of [this] case." *Thomas v. H&R Block E. Enters., Inc.*, 630 F.3d 659, 667 (7th Cir. 2011).

## IV. The District Court Clearly Erred By Piercing the Corporate Veil Based On Facts Common To Ordinary Parent-Subsidiary Relationships

In addition to these significant legal errors, the District Court clearly erred in denying Sinovel's motion to quash, given the government's flimsy factual showing. That decision would authorize piercing the veil of virtually any foreign company with a nascent U.S. subsidiary. The government's failure of proof should have been dispositive: As Sinovel argued, the government did not dispute, and the Magistrate

46

Judge found, "[w]hen a defendant raises a challenge to the sufficiency of service of process, the government bears the burden of proving its adequacy." *United States v. Porter*, No. 03-cr-129, 2008 WL 5377946, at *10 (E.D.N.Y. Dec. 23, 2008); *accord Familia De Boom v. Arosa Mercantil, S.A.*, 629 F.2d 1134, 1139 (5th Cir. 1980) (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1353 (1969)). The government failed to meet that burden.

In one paragraph, the District Court summarily concluded that the government had proven "that Sinovel USA was not independent of [Sinovel]." A-3. The court cited just four facts: (1) passing references in some Sinovel documents to Sinovel USA as a "branch office"; Sinovel's close supervision of Sinovel USA's (2) business operations and (3) finances; and (4) the fact that one U.S.-based employee of Sinovel used an email signature block identifying with Sinovel USA. *Id.* The District Court did not (and could not) suggest that the record supports any of the typical indicia of veil piercing—e.g., disregard of corporate formalities, undercapitalization, or fraud or injustice through the corporate form. On this record, the District Court clearly erred.

### A.    The record shows an unremarkable parent-subsidiary relationship and observation of corporate formalities

The record conclusively establishes key facts showing an unremarkable and proper relationship between Sinovel and its separately incorporated U.S. subsidiary. Sinovel USA was lawfully incorporated under Delaware law, and registered to transact business in Texas. *See* Doc. 54 ¶ 6, Doc. 54-1 (Delaware Certificate of Incorporation and Evidence of Filing); Doc. 54-2 (Texas).

Sinovel USA shares many of the hallmarks of independence present in cases rejecting an alter-ego theory of criminal service—including *Alfred L. Wolff*, *Pangang*, *Johnson Matthey*, and *Kolon*. Sinovel USA established and maintained its own bank accounts, filed U.S. taxes, hired its own employee, and sought business under its own name. Doc. 54 ¶¶ 7-10. At the time Sinovel caused Sinovel USA to be formed, it appointed a director and officer of Sinovel USA; that individual signed Sinovel USA's annual corporate income tax returns. Doc. 58 ¶¶ 4-8; Doc. 58-1 at 1-2; Doc. 56-4, Exh. Z-3 at 4, Exh. Z-4 at 16 (federal tax returns). Sinovel USA handled its own finances: checks were written at the direction of Sinovel USA's director, and signed by one of two individuals explicitly authorized, in the company's constituent documents, to do so. Doc. 58 ¶¶ 5-8; *see* Doc. 58-1 at 1-2 (sole shareholder consent); *see also* Doc. 56-1 at 1 (bank account in name of "Sinovel Wind Group (USA) Co., Ltd.").

The government introduced evidence that employees of the Chinese parent worked temporarily in the United States. But with one (unauthorized) exception, the government had no evidence that those employees ever held themselves out as working for Sinovel USA. To the contrary, Sinovel USA plainly advertised for, and hired, its own employee. Mads Thiel "worked for Sinovel USA as the Sales Director in the Houston office." *See* Doc. 55-4 at 1; *accord* Doc. 54 ¶ 10. As the Magistrate Judge found, Mr. Thiel "was a salaried, at-will employee of Sinovel USA." A-12 n.2. Sinovel USA paid the rent for its Houston office and apartment from its own bank accounts. Doc. 55-5 at 10, 14 (office); *id.* at 5-8, 11, 15-8, 21-23 (apartment).

48

## B.   The facts cited by the District Court do not prove otherwise

Against this background, the four facts cited by the District Court are clearly inadequate to show an alter-ego relationship.  Isolated references to Sinovel USA as a "branch office" of its Chinese parent either reflect an initial strategy prior to Sinovel USA's actual incorporation (*compare* Doc. 55-1 at 1 (March 2010 presentation showing pre-incorporation strategy), *with* Doc. 54-1 (incorporation in August 2010)), or are a natural framing for an established foreign company attempting to expand its footprint into the U.S. market through a new subsidiary. "[R]eferences in [a] parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship." *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001).

Sinovel's "close supervision" and "control" over Sinovel USA's finances and operations are commonplace features of the parent-subsidiary relationship, particularly for a nascent startup.  "A parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego." *Unocal*, 248 F.3d at 927; *accord Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459-60 (2d Cir. 1995) (no alter-ego liability where parent approved leases, major capital expenditures, and sale of assets); *Joiner v. Ryder Sys. Inc.*, 966 F. Supp. 1478, 1485 (C.D. Ill. 1996) (same; parent approved subsidiaries' acquisitions and capital budget); *Akzona, Inc. v. E.I. Du Pont De Nemours and Co.*, 607 F. Supp. 227, 238 (D. Del. 1984) (same; corporate separateness blurred in annual report, overlapping boards of directors, parental approval of large capital expenditures and guaranty of third-party loans).  The

49

government offered no evidence that there was anything unusual about the degree of Sinovel's supervision of its fledgling U.S. subsidiary.

Finally, the District Court either simply misstated or fundamentally misunderstood evidence about how Sinovel employees referred to themselves. The District Court's actual statement was that "employees[]" of *Sinovel USA* had a "tendency to refer to themselves as employees of [the Chinese parent]." A-3. But the record is devoid of such evidence. Sinovel USA had only *a single* employee, Mads Thiel, and there is no evidence to suggest that he held himself out as working for the Chinese parent. The government's own evidence showed that Thiel represented himself as "work[ing] for Sinovel USA." Doc. 55-4 at 1.

To the extent the District Court meant to say the *reverse* (i.e., employees of the Chinese parent held themselves out as working for Sinovel USA), record evidence is largely to the contrary. The government introduced evidence of numerous Sinovel employees working in the United States temporarily, who observed relevant formalities—signing contracts in Sinovel's (not Sinovel USA's) name, Doc. 59 ¶ 3, with salaries paid into Chinese bank accounts through "Sinovel's payroll in Beijing," Doc. 55-4 at 1. Although one U.S.-based Sinovel employee, Lucas Zhou, occasionally used an email signature block with Sinovel USA's name, there is no evidence that Sinovel ever authorized him to do so. Many parent

50

corporations would be alarmed to learn that one mid-level employee's unauthorized email signature block could subject the parent to veil piercing.[18]

## C.   **The District Court did not address the government's failure even to attempt diplomatic service**

Compounding these errors, the District Court overlooked the government's failure to attempt service through existing diplomatic channels—in particular, the longstanding mutual assistance agreement addressing service of process in criminal matters. The District Court should not have adopted a judge-made alter-ego theory without first requiring the government to exhaust other available means of service.

Since 2000, the U.S. and China have been party to a formal agreement on Mutual Legal Assistance in Criminal Matters ("MLAA"). *See* Judicial Assistance Agreement Between the United States of America & China (June 19, 2000) (Mandamus App. A-116 to -154), *available at* http://www.state.gov/documents/organization/126977.pdf; *see also* U.S. Dep't of State, Treaties in Force 2011—Bilateral Treaties in Force as of Jan. 1, 2011, *available at* http://www.state.gov/documents/organization/169274.pdf. The agreement provides that the parties shall assist each other "in investigations, in prosecutions, and in proceedings related to criminal matters," and that each party

---

[18] The District Court referred in passing to other facts "listed by the magistrate judge," A-3, but did not identify any. The Magistrate Judge's opinion in any event reflected similar factual errors. For instance, the Magistrate Judge appeared to rely on the fact that two signatories on Sinovel USA's bank accounts were officers of both the Chinese parent and Sinovel USA. *See* A-15, A-33. But "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership," and "that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Bestfoods*, 524 U.S. at 69.

will "use its best efforts to effect service of any document."  Judicial Assistance Agreement, *supra*, Preamble & arts. 1, 8; *cf. id.* art. 8(1) (party permitted, but not required, to serve document "which requires a person to appear as the accused").

The government concedes that diplomatic service is an "option" and that China could effect service on Sinovel under the MLAA.  Gov't Mandamus Resp. 27. That concession is telling, as this Court has previously declined to improvise novel forms of service when the government has yet to avail itself of existing channels. *E.g.*, *Hijazi*, 589 F.3d at 413 (defendant might be brought within U.S. jurisdiction if foreign nation "change[d] its mind about cooperating" due to "diplomatic pressure"). And other courts have required prosecutors to attempt diplomatic service before entertaining an alter-ego theory.  *E.g.*, *Alfred L. Wolff*, 2011 WL 4471383, at *1, *4 n.3.  Here, as there, "[t]he government has not demonstrated why it cannot pursue established channels in order to serve the summonses on [a] foreign corporate defendant[]."  *Id.*  (quashing criminal service).

<p align="center">*     *     *</p>

The District Court's alter-ego theory is inconsistent with the plain language, context, and history of Rule 4, unsupported by precedent, and has unworkable and unexamined consequences for international comity.  This Court should not become the first Court of Appeals in the nation to condone it.

## **<u>CONCLUSION</u>**

This Court should reverse the judgment below or, alternatively, grant a writ of mandamus directing the District Court to do so.

Respectfully submitted,

/s/ Matthew J. Jacobs              /s/ John P. Elwood

Matthew J. Jacobs                  John P. Elwood*

VINSON & ELKINS LLP         *Counsel of Record*

525 Market St., Suite 2750      Jeremy C. Marwell

San Francisco, CA  94105       VINSON & ELKINS LLP

Tel:  415-979-6900             2200 Pennsylvania Ave., NW

Fax: 415-651-8786             Suite 500 West

Email: mjacobs@velaw.com    Washington, DC  20037

                             Tel:  202-639-6518

Travis R. Wimberly          Fax: 202-879-8917

VINSON & ELKINS LLP       Email: jelwood@velaw.com

2801 Via Fortuna, Suite 100    Email: jmarwell@velaw.com

Austin, TX 78746-7568

(512) 542-8524

twimberly@velaw.com

*Counsel for Sinovel Wind Group Co., Ltd.*

Dated:  December 17, 2014

## **CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,928 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 12-point font.

Dated: December 17, 2014

*/s/ John P. Elwood*
John P. Elwood

## **CERTIFICATE OF SERVICE**

I certify that on December 17, 2014 I electronically filed this document with the Clerk of the Court for the U.S. Court of Appeals for the Seventh Circuit using the CM/ECF system, which will send notification of the filing to all registered users, including:

Brian L. Levine
U.S. Department of Justice
Computer Crime and Intellectual Property Division
1301 New York Avenue NW, Suite 600
Washington, DC 20530
Email:  brian.levine@usdoj.gov

Timothy M. O'Shea
Munish Sharda
United States Attorney's Office
660 West Washington Avenue, #303
Madison, WI 53703
Tel:  608-250-5467
Email: tim.oshea@usdoj.gov
Email: munish.sharda@usdoj.gov

*/s/ John P. Elwood* _____
John P. Elwood

## <u>CERTIFICATE OF COMPLIANCE WITH CIR. R. 30(d)</u>

Under Circuit Rule 30(d), I certify that all materials required by Circuit Rule 30(a) and (b) are included in the appendix below.

Dated: December 17, 2014

<div style="margin-left: 40%;">

*/s/ John P. Elwood*
John P. Elwood

</div>

# APPENDIX TABLE OF CONTENTS

Page

Appendix A: District Court Order Denying Motion to Quash Service
  (Sept. 10, 2014) ............................................................. A-1

Appendix B: Magistrate Judge Order Denying Motion to Quash Service
  (May 27, 2014) ............................................................. A-8

Appendix C: Indictment (June 27, 2013) ............................................. A-36

Appendix D: Federal Rule of Criminal Procedure 4 ................................ A-48

**United States Court of Appeals for the Seventh Circuit**

**Appellant's Brief**

**<u>Appendix A</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

                                          OPINION AND ORDER

                Plaintiff,

                                       13-cr-84-bbc

        v.

SINOVEL WIND GROUP CO., LTD.,
d/b/a SINOVEL WIND GROUP (USA)
CO., LTD., SU LIYING, ZHAO HAICHUN,
and DEJAN KARABASEVIC a/k/a DAN
KARABASEVIC,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this criminal proceeding, the United States attempted to serve a summons and complaint on defendant Sinovel Wind Group Co., Ltd. (Sinovel China) by delivering and mailing a copy of the summons and complaint to Sinovel China's subsidiary, Sinovel Wind Group (USA) Co., Ltd. (Sinovel USA).  Sinovel China appeared specially in this court to challenge the exercise of jurisdiction over it, contending that the government's service attempt was inadequate and, as a result, the government lacks jurisdiction to proceed against it.

Sinovel China' challenge to service was full briefed before United States Magistrate Judge Stephen L. Crocker, who issued a 27-page opinion and order on May 27, 2014, denying Sinovel China's motion to quash the service of the summons and complaint and

concluding that the government's service was sufficient for jurisdictional purposes.  The matter is now before this court on Sinovel China's objections to the magistrate judge's order and its request for reconsideration of that order.  Because Sinovel China is the only defendant objecting to the magistrate judge's order, I will refer to it as defendant for the remainder of the opinion.

Defendant devotes a large portion of its objections to challenging the factual inferences that the magistrate judge drew from the record.  I find these factual challenges unpersuasive; the facts are more than sufficient to show that Sinovel USA was not independent of defendant for all the reasons listed by the magistrate judge, including the references to Sinovel USA as a "branch office" of defendant, the close supervision of Sinovel USA's activities by the parent organization, the parent's close control of all finances and the employees' tendency to refer to themselves as employees of defendant.

Turning to the magistrate judge's legal conclusions, defendant takes issue with the conclusion that Fed. R. Crim. P. 4 allows this court to exercise jurisdiction over defendant based solely on the fact of service of the summons and indictment on a domestic subsidiary that has been found to be the alter ego of its parent organization.  Its primary argument is that the majority of courts have found similar efforts to serve a criminal summons upon a corporate subsidiary ineffective as a means of service on the parent organization.  This is technically true; twice as many cases have ruled this way as have not, but the "minority" consists of two cases; the "majority," of four, and the four provide questionable support for defendant's position.  In three of the four cases, the courts acknowledged the proposition

2

that service upon a subsidiary could constitute service on the parent when the subsidiary is shown to be a mere conduit for the parent's activities, but found that such a showing had not been made in the cases before them.  United States v. Kolon Industries, Inc., 926 F. Supp. 2d 794, 807-08 (E.D. Va. 2013) (noting that, as general proposition, service upon subsidiary does not constitute service on parent, but one of two "widely recognized" exceptions to rule is "where the subsidiary serves as the 'alter ego' of the parent"); United States v. Pangang Group Co., Ltd., 879 F. Supp. 2d 1052 (N.D. Cal. 2012) (refusing to find service on domestic subsidiary was sufficient when showing of parental control of subsidiary had not been made); United States v. Johnson Matthey PLC, 2007 WL 2254676 *1, n.13 (E.D. Va. Aug. 2, 2007) ("'[S]ervice of process on a foreign defendant's wholly-owned subsidiary is not sufficient to effect service on the foreign parent so long as the parent and the subsidiary maintain separate corporate identities.'")

Even the fourth case, United States v. Alfred L. Wolff GmbH, 2011 WL 4471383 (N.D. Ill. Sept. 26, 2011), adds little to defendant's position.  In Wolff, the question was not whether the subsidiary corporations were independent of the parent but whether the government had shown that the subsidiary corporations were formed only to perpetrate a fraud on the United States.  Wolff was decided against the government after the court found that the government had failed to make the showing that the corporate structure was used for fraudulent purposes.

Against this background, the cases cited by the magistrate judge, United States v. Chitron Electronics, Ltd., 668 F. Supp. 2d 298 (D. Mass. 2009), and United States v. The

3

A-4

Public Warehousing Co., 2011 WL 1126333 (N.D. Ga. Mar. 28, 2011), are not the outliers defendant says they are.  Chitron appears to be the first instance in which a court adopted the alter ego doctrine in a case involving service of a criminal summons.  The government indicted Chitron, a Chinese company, for illegally shipping military parts from the United States to China.  Chitron challenged the service of process on its Massachusetts-based subsidiary; the court found that such service constituted service on the parent because the subsidiary was the alter ego (a "mere conduit") of the parent and the indictment charged fraudulent practices by both the subsidiary and the parent.  Chitron, 558 F. Supp. 2d at 305. In the second case, Public Warehousing, 2011 WL 1126333 at *5, a Georgia district court held that Fed. R. Crim. P. 4 allowed service on a foreign corporation through a domestic subsidiary when the subsidiary was shown to be so dependent on its parent as to be the parent's alter ego.

       In short, I am not persuaded by defendant's assertion that it was error for the magistrate judge to find that service of a criminal summons upon a domestic subsidiary can constitute sufficient service when the subsidiary is the alter ego of its foreign parent.

       The magistrate judge found "no good reason to depart from the general rule that state law . . . governs the analysis" of the effectiveness of serving a subsidiary in place of its foreign parent.  Defendant accepts this premise and agrees that Delaware law applies because Delaware is the state of incorporation of defendant's subsidiary.  It disagrees, however, with the magistrate judge's conclusion that Delaware law permits a federal court to assert jurisdiction over a domestic subsidiary shown to be the alter ego of its foreign parent.

4

From my own review of the applicable law, I agree with the magistrate judge that Delaware distinguishes between the showing that must be made to obtain jurisdiction over a parent organization and the showing required to pierce the corporate veil for liability purposes. E.g., <u>Zhai v. Stein</u>, 2012 WL 1409358, *7 (Del. Sup. Jan. 6, 2012).  To obtain jurisdiction over defendant, the government has to show only that Sinovel USA is the alter ego of defendant, in other words, that it has no independent reason for existence.  It has made this showing.   As the magistrate judge concluded,

> Sinovel USA's sole function was and is to do the acts and bidding of Sinovel China, while giving Sinovel China a jurisdictional firewall against liability and culpability.  Sinovel USA was Sinovel China's puppet, so that its presence and acts in the U.S. can be imputed to Sinovel China.

Op. & Order, dkt. # 68, at 26.  At this stage of the proceedings, no further showing need be made to support this court's exercise of jurisdiction over defendant.


ORDER

IT IS ORDERED that the motion to quash the government's service of summons of the criminal complaint and indictment filed by defendant Sinovel Wind Group Co., Ltd. is DENIED.

Entered this 10th day of September, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

5

6

**United States Court of Appeals for the Seventh Circuit**

**Appellant's Brief**

**<u>Appendix B</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

OPINION AND ORDER

Plaintiff,

v.                                                                  13-cr-84-bbc

SINOVEL WIND GROUP CO., LTD., dba
SINOVEL WIND GROUP (USA) CO., LTD.,
SU LIYING, ZHAO HAICHUN, and
DEJAN KARABASEVIC *aka* DAN KARABASEVIC,

Defendants.

---

Defendant Sinovel Wind Group Co., Ltd. (Sinovel China), appearing specially to

challenge jurisdiction, has moved to quash service of summons of the criminal complaint and

indictment on the ground that the government's attempts at service did not comply with Fed.

R. Crim. P. 4. *See* dkt. 50. Because Sinovel China has no office or representatives in the U.S.,

the government attempted to execute service by delivering and mailing a copy of the summons

and complaint to its subsidiary, Sinovel Wind Group (USA) Co., Ltd. (Sinovel USA), a practice

that typically is not allowed under the federal rules. As the parties have noted from the outset,

this motion presents an issue that is not well developed by the federal courts and for which there

is no clear answer. Regardless which way this court rules on Sinovel China's motion, the loser

will appeal,[1] perhaps generating some useful circuit case law on this point.

Given that the law on this issue is undeveloped and that there are facts that point in both

directions, perhaps this court could justify a ruling in either direction. That said, I conclude that

Sinovel USA was merely an alter ego of—virtually a front for—Sinovel China under Delaware

---

[1] First to the district judge under 28 U.S.C. § 636(b)(1)(a), then to the Court of Appeals for
the Seventh Circuit.

law (the state in which Sinovel USA was incorporated).  As a result, I find that the government's service of process on Sinovel USA constituted proper service on Sinovel China under Rule 4. Accordingly, I am denying Sinovel China's motion to quash.

In presenting their positions to the court, both sides refer to the allegations in the indictment and both sides rely on facts drawn from evidence presented to the grand jury, affidavits and other documents to describe the corporate relationship between Sinovel China and Sinovel USA and the government's attempts at service.   Neither party challenges the authenticity of the opposing party's submissions, and other courts have considered similar evidence in assessing whether service complied with Fed. R. Crim. P. 4.  *See, e.g., U.S. v. Pangang Group Co., Ltd.*, 879 F. Supp. 2d 1052, 1057-64 (N.D. Cal. 2012); *U.S. v. Alfred L. Wolff GmbH*, 2011 WL 4471383, *3 (N.D. Ill. Sept. 26, 2011); *U.S. v. Chitron Electronics Co. Ltd.*, 668 F. Supp. 2d 298, 300 (D. Mass. 2009).  *See also* Fed. R. Crim 47(b) ("A motion may be supported by affidavit.").  As a result, solely for the purpose of deciding the motion to quash, I have drawn the following facts from the indictment, affidavits and grand jury evidence relied on by the parties:

ALLEGATIONS OF FACT

## I.  Background

Sinovel China, incorporated in the People's Republic of China, manufactures and exports wind turbines.  Sinovel USA was formed in 2010 as a U.S. subsidiary of Sinovel China with offices in Houston, Texas.  Dkt. 54, ¶ 6.  Sinovel USA is incorporated under Delaware law and it is registered to transact business in Texas as a foreign for-profit corporation.  *Id*.

2

At the time of Sinovel USA's incorporation, its sole director was Han Junliang, then President and Chief Executive Officer (CEO) of Sinovel China, as well as Chairman of Sinovel China's Board of Directors.  Dkt. 53 at 7; GJ Tr. at 14, 16; GJ Exh. Z-2 at 2-3; dkt. 55, Exh. 12 at 4.  In August 2012, Wei Wenyuan became president of Sinovel China and the sole director of Sinovel USA.  Dkt. 58, ¶ 4; GJ Tr. at 18; GJ Exh. Z-7 at 30.  Both Han and Wei resided in China.  GJ Tr. at 14, 18.  Li Lecheng was vice president of Sinovel China and reported to Han.

Between May 31 and July 1, 2013, the government served Sinovel China by delivering a copy of a summons and complaint dated May 30, 2013 to Sinovel USA's Houston office and to Capitol Corporate Services, the registered agent for Sinovel USA in Delaware and Texas.  Dkt. 36; dkt. 55-9, Exh. 10.  The government also mailed a copy of the summons and complaint to Sinovel USA's last known address in Houston.  *Id.*

On June 27, 2013, a federal grand jury returned a three-count indictment charging Sinovel China and other defendants with conspiracy to steal trade secrets, theft of trade secrets and wire fraud related to the intellectual property and confidential business information of AMSC, a U.S.-based company that produces equipment and software for wind turbines and electrical grids.  Dkt. 25.  The indictment alleges that Sinovel China was doing business as Sinovel USA in the United States.  *Id.* at ¶6.

## II.  Sinovel China's Allegations

According to Yongji Shi, the manager of the Department of General Affairs at Sinovel China, Sinovel China has never had an address in the Western District of Wisconsin.  Dkt. 54, ¶¶ 1, 4.  He avers that since its incorporation in 2010, Sinovel USA has established and

maintained its own bank accounts, filed its own U.S. taxes, hired an employee (Mads Thiel as

Associate Director of Sales)[2] and sought business in its own name.  *Id.*, ¶¶ 7-8.

On October 26, 2010, Sinovel China executed a "Unanimous Written Consent of the

Sole Shareholder of Sinovel Wind Group (USA) Co., Ltd.," stating that "HAN Junliang and LI

Lecheng be authorized, empowered and directed to open a[] [bank] account in the name of

[Sinovel USA]" and "to execute .. . signature cards and other documents in connection with such

account."  Dkt. 58, ¶ 5 and exh. 1.  The resolution also provided that

> any and all actions . . . hereinafter taken by . . . any director . . . or
> any other authorized person within the terms of the forgoing
> resolutions be and hereby are ratified, confirmed, authorized and
> approved as the act and deed of [Sinovel USA] in all respects.
>
> *Id.*

Han and Li were the two signatories on Sinovel USA's bank account with Bank of America.  *Id.*

at ¶ 6.

Li did not have authority to authorize payments or to make decisions on behalf of

Sinovel USA.  Dkt. 58, ¶ 7.  Before signing any check from Sinovel USA's account, Li consulted

with Han or Wei to obtain approval.  *Id.* at ¶ 8.  On September 25, 2012, Li signed a check for

$55,000 to be drawn on Sinovel USA's bank account.  *Id.* at ¶ 9.  The payment reflected a

"termination agreement and mutual release entered into as of 12 September 2012, by and

between WESCO Wind, LLC and Sinovel Wind Group Co., Ltd."  *Id.*  Li avers that the payment

was made on behalf of Sinovel China from Sinovel USA's bank account because it would not

---

[2] Thiel was paid by "Employer Flexible HR Inc.," a human resources company.  Although the
government alleges that Thiel was an independent contractor, dkt. 55 at 5 n.4, Sinovel China has
submitted his employment contract indicating that he was a salaried, at-will employee of Sinovel USA,
*see* dkt. 57, exh. C.

have been possible to transfer funds in time from Sinovel China's bank accounts in China to a recipient in the United States. *Id.* at ¶ 10. Sinovel China satisfied its obligation by arranging for Sinovel USA to make the payment on its behalf. *Id.* Sinovel USA's Houston-based accountant recorded it as an amount "[d]ue [to Sinovel USA] from shareholder" Sinovel China. Dkt. 57, exh. 1. Several months later when Sinovel USA filed its 2012 U.S. corporate income tax return, it reported the $55,000 (together with another amount due from Sinovel China) as an "other asset" for purposes of federal income tax recording. *See id.*; GJ Exh. Z-5 at 22.

## III. Government's Allegations

Sinovel China publicly referred to Sinovel USA as a "regional office" or a "branch office" in Houston, Texas. Dkt. 55, Exh. 1 at 2 and Exh. 2 at 1-2; Grand Jury (GJ) Exh. Z-2 at 2. Sinovel USA is 100% owned by Sinovel China. Dkt. 53 at 7; GJ Tr. at 16; GJ Exh. Z-3 at 8, 10; GJ Exhibit Z-5 at 21, 23. As a result, Sinovel China's stockholders are Sinovel USA's stockholders. Dkt. 53 at 7; GJ Tr. at 16; GJ Exh. Z-3 at 8, 10; GJ Exh. Z-5 at 21, 23.

### A. Employees

Sinovel China sent its Beijing employees to work in the United States for a couple of days or a couple of months at a time and then they returned to work at Sinovel China in Beijing. GJ Tr. at 7, 24. The Sinovel China employees who worked for brief periods in Houston were in the United States on B1/B2 visas sponsored by Sinovel China. GJ Tr. at 10; http://travel.state.gov/visa/temp/types/types _1262.html.

Regardless whether they worked in Houston or Beijing, these employees were paid by Sinovel China through an automatic deposit to their personal bank accounts in China.  GJ Tr. at 9.  Sinovel China also provided these employees with a per diem of $65 per day to cover their daily living expenses while they were working in Houston.  *Id.*  The per diem also was automatically deposited into each employee's personal bank account in China.  *Id.*  Sinovel China provided its transient Houston employees with an apartment to live in and paid all expenses associated with the apartment, including the cable and electric bills, through a Sinovel China corporate credit card, travel voucher or check.  GJ Tr. at 7, 12.

Employees in the Houston office provided weekly telephonic progress reports to their Sinovel China supervisors in Beijing, discussing what had happened the prior week and what was planned for the next week.  GJ Tr. at 13.  These Houston employees would speak on the telephone with supervisors in Beijing who would provide approvals and direction about what the employees working in Houston should do.  *Id.*

Sinovel employees received postal mail correspondence about U.S. business at their Beijing address for Sinovel China.  GJ Tr. at 19-20.  In addition, these employees referred to themselves in business emails as working at Sinovel in Beijing, China.  GJ Tr. at 21.  In fact, at least one employee acknowledged that, although he occasionally referred to himself in the context of Sinovel USA, he still understood himself to be working for Sinovel China.  GJ Tr. at 23-24 (employee indicated that the signature on email indicated he was part of Sinovel Wind Group (USA)).

6

### B.  Corporate Finances

Sinovel China paid the Houston office's expenses and set strict limitations on spending for the Chinese nationals visiting Houston.  GJ Tr. at 9-10.  Other than nominal expenses (e.g., office supplies, gas, etc.), the Houston employees were not permitted to spend corporate funds—even for official travel—without express approval from their Sinovel China managers in Beijing.  *Id.* at 11.

The Houston office had two bank accounts—a Citibank account and a Bank of America account—in the name of Sinovel USA, dkt. 51 at 27, but the checkbooks for these accounts were kept in Beijing.  GJ Tr. at 12; dkt. 56, Exh. 5 at 3-25.  No Sinovel USA employee was authorized to sign checks using the Sinovel USA accounts, and the only authorized users of the accounts were located at Sinovel China.  GJ Tr. at 12; dkt. 56, Exh. 5 at 1-2.  Thus, Sinovel China's Houston employees had to obtain a signed check, sent via Federal Express from someone in China, to pay any significant expense.  GJ Tr. at 12; dkt. 55, Exh. 5 and Exh. 6 at 16-18, 21.  As noted above, Sinovel China settled a potential civil dispute against it by using funds in Sinovel USA's bank account.  Dkt. 55, Exh. 14 at 37-43, 47-57.

Sinovel China controlled and signed Sinovel USA's corporate tax returns.  GJ Tr. at 15-18; GJ Exh. Z-3 at 4; Z-4 at 16; Z-5 at 17; Z-6 at 29; Z-7 at 30.  The senior business development manager for Sinovel USA, Zhi Zhou, was responsible for providing the documentation necessary to prepare Sinovel USA's taxes to an accounting firm employed by Sinovel China.  GJ Tr. at 15.  Once the documentation was gathered and the appropriate tax forms were prepared, Zhou scanned the documents and emailed them to Sinovel China.  *Id.*  The tax forms were signed by the president of Sinovel China.  *Id.*  Zhou then delivered the signed tax

7

forms to the accounting firm so the forms could be filed.  GJ Tr. at 15; GJ Exh. Z-3 at 4; Z-4 at 16; Z-5 at 17; Z-6 at 29; Z-7 at 30.

### C. Operations and Decision-Making

Sinovel USA's office was actually a "virtual office space" leased from Businesssuites.  *See* www.businesssuites.com; dkt. 55, Exh. 6.  The office was small, accommodating only two or three cabinets and three or four individuals at a time.  On the other hand, several hundred employees work in Sinovel China's corporate office in Beijing, while 20,000 to 30,000 employees worked in its manufacturing plants located throughout China.  GJ Tr. at 31-32.  The lease for the Houston office was in the name of Sinovel China, and the rent was paid by Sinovel China.  Dkt. 55, Exh. 6 at 7-10, 15-18, 21.  Sinovel USA regularly failed to pay its rent or registered agent on time because Sinovel China held the funds to make those payments.  *Id.* at 15-18, 21; dkt. 55, Exh. 3 at 31-32, 35-38.

Sinovel USA did not have its own separate website but instead shared the web address of www.sinovel.com with Sinovel China.  *See* http://web.archive.org/web/201305 20160219/http: /www.sinovel.com/ (reflecting Sinovel's website as of May 20, 2013).  Sinovel USA did not have its own sub-page within the general Sinovel website.  *Id.*  The Chinese nationals who worked from Sinovel's Houston office did not have separate Sinovel USA email addresses.  GJ Tr. at 20-21.  Instead, they used their standard Sinovel China email address of @sinovel.com or @sinovelwind.com.  GJ Tr. at 20-21, 23-24.

Sinovel USA did not have any managers of its own.  GJ Tr. at 8, 10-11, 32. Sinovel China employees working in Houston office were supervised from Beijing by Li LeCheng, Vice

President of Sinovel China, or by one of Li's subordinate managers at Sinovel China.  GJ Tr. at 8; dkt. 55, Exh. 4 at 1.  Employees working in the Houston office could not make independent business decisions.  GJ Tr. at 11; GJ Exh. Z-16 at 58-94 and Z-17 at 94-154; dkt. 55, Exh. 13 at 13-18, 20-26, 28, 34, 125-149.  For example, the Houston employees could not submit bids on projects or sign contracts without approval from managers in Beijing.  GJ Tr. at 3 and 11; dkt. 51 at 20; dkt. 53 at 3; dkt. 55, Exh. 13 at 13-18, 20-26, 28, 34, 125-149.

Sinovel China's managers regularly negotiated and signed contracts with United States companies on behalf of Sinovel China.  GJ Tr. at 24 and 26; GJ Exh. Z-16 at 58-94 and Z-17 at 95-154; dkt. 55, Exh. 13 at 125-149; dkt. 55, Exh. 14 at 44-46.  Sinovel China representatives signed the contracts for and coordinated the four projects involving Massachusetts turbines at issue in the criminal indictment.  GJ Tr. at 25-26; GJ Exh. Z-16 at 58-94; GJ Exh. Z-17 at 95-154.

### D.  Zhou and Closure of Houston Office

Zhi "Lucas" Zhou worked for Sinovel China from May 2010 to May 2013.  GJ Tr. at 9. Although Zhou's title changed from "Senior Project Manager" for Sinovel China to "Senior Business Development Manager" for Sinovel USA in December 2011, no other aspect of his job changed; the title change was nominal only.  GJ Tr. at 23-24; GJ Exh. Z-9 at 32; Z-10 at 39; Z-11 at 41-42; Z-12 at 43; Z-13 at 46-47; *but* see dkt. 55, Exh. 13 at 122.  Zhou continued to use the same email address to communicate with Sinovel's Massachusetts clients, and for Zhou, nothing changed.  GJ Tr. at 20-21, 23-24.  Regardless whether Zhou was in China or the United States, he worked for Sinovel China, was paid his salary and per diem by Sinovel China and

needed approval from Sinovel China to enter into any business contracts or submit bids for new business. *Id.* at 23-24.

Sometime in May 2013, Grace Zhang, a Sinovel China supervisor, told Zhou that Sinovel China would not renew its lease of the Sinovel Houston office. GJ Tr. 26-27; dkt. 55, Exh. 8 at 4. On May 28, 2013, Zhou notified Zhang that he would resign from Sinovel China. GJ Tr. at 26-27. Zhang instructed Zhou to take all of the important documents out of the Houston office and bring them to the Sinovel apartment in Houston. *Id.* at 27; dkt. 55, Exh. 8 at 4. Zhang also instructed Zhou to destroy the remaining documents, allegedly "just some garbage or very old brochures." GJ Tr. at 27; dkt. 55, Exh. 8 at 4. These instructions came shortly after the FBI visited the Houston office and spoke to Wei "William" Xue, another Sinovel China employee. GJ Tr. at 29-30; dkt. 55, Exh. 8 at 5.

Despite Zhou's resignation, he retained the keys to the Houston office, the Houston apartment and the corporate vehicle in Houston. GJ Tr. at 28-29. Zhou transported documents to the Houston apartment as instructed and used the corporate vehicle to drive Xue to the airport so Xue could return to China and continue to work for Sinovel China. GJ Tr. at 27-28; dkt. 55, Exh. 8 at 5.

When Sinovel China abruptly closed its Houston office, it still had service contracts to fulfill for the four Massachusetts wind turbines. GJ Exh. Z-16 at 58-89, dkt. 55, Exh. 15. By mid-June 2013, Sinovel China—not Sinovel USA—negotiated and entered into a service contract with a separate United States's entity to fulfill Sinovel's contractual obligation to service the Massachusetts wind turbines. Dkt. 55, Exh. 15. Sinovel China asked the new service contractor to retrieve certain items its employees had left in an apartment in the United States,

explaining that it could not send its own employees because of the "litigation" in the United States. *Id.*


## IV. Indictment; Service of the Summons

On June 27, 2013, the grand jury sitting in this district returned a three count indictment against Sinovel China and others.  The grand jury alleged that Sinovel China was doing business in the United States as Sinovel USA.  Dkt. 25 at 3.  On June 5, 2013 an FBI agent hand-delivered a summons to answer the indictment to Sinovel USA's registered agent in Dover Delaware; the corporate agent later confirmed that Sinovel USA still was listed as being in "Good Standing." Dkt. 55-9 at 20 & 24.  On June 28, 2014, the U.S. Attorney's Office in this district sent through Federal Express a copy of the summons and indictment to Sinovel USA at the address of its office in Houston.  *Id.* at 37 & 41. On July 1, 2013, an FBI agent served process on Sinovel USA's registered agent in Austin Texas.  *Id.* at 25.


## OPINION

## I.  Service of Process Requirements

Fed. R. Crim. P. 4(c)(3)(C) requires that a summons be served on an organization by (1) "delivering a copy to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process;" and (2) mailing a copy "to the organization's last known address within the district or to its principal place of business elsewhere in the United

11

States."  *See also Murphy Bros., Inc. v. Michetti Pipe Stringing*, 526 U.S. 344, 350 (1999) ("Service of process . . . is fundamental to any procedural imposition on a named defendant.").[3]

Sinovel China contends that the government has failed to meet the first requirement because the government has only delivered a copy of the summons to the registered agent of Sinovel USA, and it cannot meet the second requirement because Sinovel China has never had an address within the Western District of Wisconsin and has no principal place of business within the United States.  The government contends that it properly served Sinovel China by serving the summons on Sinovel USA's registered agent, Capitol Services, and by sending copies of the summons via certified mail to Sinovel USA's last known address in Houston, Texas.

Because the case law discussing jurisdiction over foreign corporations in the criminal context is "surprisingly sparse and poorly developed," some courts have looked to civil law for guidance.  *Chitron*, 668 F. Supp. 2d at 302.  In the civil context, it is well-settled that service on a subsidiary generally does not constitute service on a corporate parent, even if the subsidiary is wholly-owned by the parent. *U.S. v. Bestfoods*, 524 U.S. 51, 61–2 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation ... is not liable for the acts of its subsidiaries."); *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336–37 (1925); *Alfred L. Wolff*, 2011 WL 4471383 at *3 (noting same in criminal case).  The government seeks to clear this hurdle by asking this court to apply the civil "alter ego" doctrine in order to obtain jurisdiction over Sinovel China as a criminal

---

[3] In a very brief argument at the end of its response brief, the government points out that two federal courts have found that although the mailing requirement is mandatory, it is not jurisdictional. Dkt. 55 at 32-33 (citing *U.S. v. Kolon*, 926 F. Supp. 2d 794, 800-02 (E.D. Va. 2013) and *U.S. v. Dotcom*, 2012 WL 4788433, *1 n.1 (E.D. Va. Oct. 5, 2012)).  However, because the government has not developed this argument and because this issue does not affect the outcome of the pending motion, I have not addressed it.

defendant in this court.  Although it is not clear whether it is appropriate to use this standard in this context, a few other courts have done so and it strikes this court as fair and logical to use it here.

## II.  Alter Ego Doctrine

The alter ego doctrine typically is used to pierce the "corporate veil" or to disregard a corporate fiction of a subsidiary in order to reach a controlling entity, such as a shareholder or parent corporation.  *Taurus IP v. DaimlerChrysler Corp.*, 519 F. Supp. 2d 905, 918-19 (W.D. Wis. 2007), *aff'd* 726 F.3d 1306 (Fed. Cir. 2013) (citing *Select Creations, Inc. v. Paliafito America, Inc.*, 852 F. Supp. 740, 773-74 (E.D. Wis. 1994)).  As the government notes, the doctrine is relevant both to liability and to personal jurisdiction.  *Id.* at 719 (citing *IDS Life Insurance Co. v. SunAmerica Life Insurance Co.*, 136 F.3d 537, 540 (7th Cir. 1998); *see also Inter-Med, Inc. v. ASI Med., Inc.*, 2010 WL 3063014, *6 (E.D. Wis. Aug. 2, 2010) (although alter ego doctrine typically used for liability purposes, it is also relevant to personal jurisdiction).  If court decides to pierce the corporate veil, then the court may attribute the subsidiary's acts and contacts within the forum to the parent corporation.  *Id.*; *Select Creations, Inc. v. Paliafito America, Inc.*, 852 F. Supp. 740, 774 (E.D. Wis. 1994) ("both the alter ego and the controlled entity will be subject to the jurisdiction of the Court, so long as one of the parties is subject to jurisdiction in its own right").  At least in the civil context, courts have found that the alter ego doctrine also provides that service on a subsidiary is appropriate if the subsidiary was the alter ego of the parent corporation.  *U.S. v. Kolon*, 926 F. Supp. 2d 794, 814 (E.D. Va. 2013); *Brunswick Corp. v. Suzuki Motor Co., Ltd.*, 575 F. Supp. 1412, 1419 (E.D. Wis. 1983); *Energy Reserves Group, Inc. v. Superior*

*Oil Co.*, 460 F. Supp. 483, 503 (D. Kan. 1978) (if non-resident corporation receives service solely on its subsidiary in forum, alter ego analysis necessary to resolve sufficiency of service issue).

The first court to consider and adopt this doctrine in a *criminal* service of process case was the District of Massachusetts in *Chitron*, 668 F. Supp. 2d 298, in 2009. *But see U.S. v. Johnson Matthey PLC*, 2007 WL 634269 (D. Utah Feb. 26, 2007) (although parties did not argue application of alter ego doctrine, court held that criminal service on subsidiary not sufficient service on parent company). The court in *Chitron* did not cite any authority for its action. However, in addressing Chitron's motion to dismiss for lack of personal jurisdiction, the court discussed two circuit court cases involving the enforcement of grand jury subpoenas issued to foreign corporations in which the courts of appeals applied civil law related to establishing personal jurisdiction. *See id.* at 302 (citing *In re Sealed Case*, 832 F.2d 1268, 1272-73 (D.C. Cir. 1987) and *Matter of Marc Rich & Co., A.G.*, 707 F.2d 663, 666-68 (2d Cir. 1983)).

Two years later, a judge in the Northern District of Georgia followed *Chitron*'s lead and applied the alter ego doctrine to find that service on a foreign corporation's domestic subsidiary satisfied the requirements of Rule 4. *U.S. v. The Public Warehousing Co.*, 2011 WL 1126333 (N.D. Ga. Mar. 28, 2011). The court noted that applying the alter ego doctrine was consistent with Fed. R. Crim. P. 2, which instructs that the federal criminal rules should be interpreted to "secure simplicity" and "eliminate unjustifiable expense and delay." *Id.* at *7; *see also U.S. v. Dotcom*, 2012 WL 4788433 (E.D. Va. Oct. 5, 2012) (applying similar analysis of Rule 2).

No federal court of appeals and no court in this district has adopted the alter ego doctrine in a criminal service case. *Alfred L. Wolff*, 2011 WL 4471383, *4 (noting same). In addition to

*Chitron* and *Public Warehousing*, this issue has arisen in three other federal districts, including the Northern District of Illinois.  However, in those cases, the courts did not actually apply the doctrine because they found that the government had not established that the domestic subsidiary was the alter ego of a foreign parent corporation.  *Kolon*, 926 F. Supp. 2d at 814 (noting parties agreed that service on subsidiary would have been appropriate had subsidiary constituted alter ego of parent corporation); *Pangang,* 879 F. Supp. 2d at 1066 (noting that it was "persuaded that the only way for the government to show that it has complied with the mailing requirement is through the alter ego doctrine" but finding government did not meet test); *Alfred L. Wolff*, 2011 WL 4471383 (taking no position on use of alter ego doctrine because government had not met heavy burden of veil piercing analysis).  Obviously, piercing the corporate veil in the criminal context is viewed as an uphill slog for the government.  Apparently, however, it is a slog that the government is entitled to attempt, and the court will allow that attempt in this case.

### A.  Choice of Law

Once we pass this fork in the road, a new fork presents itself:  the parties dispute what law should govern the alter ego analysis.  The Supreme Court has held that "[a]s a general matter, the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation."  *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983); *see also On Command Video Corp. v. Roti*, 705 F.3d 267, 272 (7th Cir. 2013) ("veil-piercing claims are governed by the law of the state of the corporation whose veil is sought to be pierced"); *Alfred L. Wolff*, 2011 WL 4471383 at *5 (citing *First National* and

applying alter ego test from state where defendant's subsidiary incorporated).  Courts applying

the alter ego doctrine for jurisdictional purposes have abided by this rule.  *See, e.g., Inter-Med*,

2010 WL 3063014, at *7; *Taurus IP,* 519 F. Supp. 2d at 919; *Select Creations*, 852 F. Supp. at

774.  As a result, defendant contends that Delaware law applies to the alter ego analysis because

Sinovel USA was incorporated in that state.

Because Delaware sets a high bar for litigants seeking to pierce the corporate veil—often

requiring a showing that the subsidiary used for fraudulent or unfair purposes—the government

proposes a more relaxed alter ego test based on federal common law.  According to the

government, this court should apply "a flexible federal standard for service of process that looks

not just to corporate formalities but to "'the substance and reality of the situation.'"  Dkt. 55

at 19-20 (quoting *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710, 717 (7th Cir. 1965)).  Citing a

corporate treatise and a few hoary Seventh Circuit cases, the government contends that federal

courts commonly pierce the corporate veil whenever there is a lack of separate identity *or*

corporate forms have been used for morally culpable purposes.  *See* 1 Philip L. Blumberg,

*Blumberg on Corporate Groups* § 1301 (2d ed. 2005); *Clark v. Universal Builders, Inc.*, 501 F.2d

324, 337 (7th Cir. 1974); *Kavanaugh,* 353 F.2d at 717.

The government's cited authorities have little relevance to the instant case.  The section

of *Blumberg* cited by the government actually references the unique standard applied by the

Second Circuit, which has abandoned the classic three-factored veil piercing test often used in

state law and adopted a disjunctive standard.  *Id.  Clark* was a civil rights case in which the court

of appeals allowed plaintiffs to compare housing pricing policies between defendants' two

commonly owned and managed corporations.  501 F.2d at 337.  The court did not discuss the

16

alter ego doctrine or veil piercing, noting only that "corporate formalities may be disregarded in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights," as is the with alleged civil rights violations. *Id.* (internal citations omitted).  Although the court of appeals in *Kavanaugh*, 353 F.2d at 717, held that the "fiction of the corporate entity" will be disregarded whenever it has been adopted or used to evade the provisions of a statute, the court was applying a limited exception to the rule that shareholders cannot sue for injuries to the corporation under the Automobile Dealers' Day in Court Act.  *Id.*; *see also Caruana v. General Motors Corp.*, 204 Fed. Appx. 511, 514 (6th Cir. 2006) ("Later analysis of *Kavanaugh* has essentially limited it to situations where the manufacturer also owns a controlling interest in the dealership.").

In a separate argument, the government suggests that the choice of law question is muddled because the Court of Appeals for the Seventh Circuit has held that state corporate law does not govern claims resting on federal law where "some federal statute or regulation addresses the subject" or "override is essential to achieve federal objectives."  *U.S. v. Castellano*, 349 F.3d 483, 486 (7th Cir. 2003).  *See also  Illinois Bell Telephone Co., Inc. v. Global NAPs Illinois, Inc.*, 551 F.3d 587, 598 (7th Cir. 2008) ("[A] state's restrictive law of veil piercing is not allowed to undermine the effectiveness of a federal statute that provides remedies for persons who may find it impossible to vindicate their federal rights if opposed by such a law.").  Seizing on this language, the government argues that a less restrictive federal alter ego standard better meets the objectives of the Economic Espionage Act (EEA)—the criminal statute at issue in this case—which seeks to redress public wrongs committed by foreign entities.  However, neither of

17

the cases cited by the government address the issue presented in this case or discuss what circumstances or federal objectives might justify a federal "override" of state alter ego law.

In *Castellano*, 349 F.3d at 486, the government argued that federal common law should be used to apply a sentence enhancement to an individual defendant because his co-defendant was a closely held corporation. The court of appeals rejected the argument, finding that there was no reason to apply federal common law when the norm was to borrow from state corporate or agency law. *Id.* Although the court noted that exceptions could apply where "override was essential to achieve federal objectives," it did not undertake this analysis. *Id. Illinois Bell* comes closer to the mark because it involved piercing the corporate veil of a subsidiary to obtain personal jurisdiction over the parent corporation. However, the court of appeals specifically noted that "we doubt that there will be any need in this case to depart from the Delaware [state] standard." *Id.* As a result, the law discussing when federal law should override state law with respect to the alter ego doctrine is far from clear and relatively untested, especially in the criminal context. Perhaps the instant prosecution will provide the Court of Appeals for the Seventh Circuit an opportunity to weigh in and clarify, but that is a decision to be made at the circuit level.

Even assuming, *arguendo*, that federal law could override state law in this case, the government has not made a strong case for doing so. It is self-proving to note that a more lenient standard for federal service would bolster the government's attempts to prosecute foreign entities for the theft of trade secrets under the EEA. This is true of any standard or rule that the government sees as an impediment to its ability to maximize the reach and application of the EEA. There is significant curb appeal to giving federal prosecutors freer rein to pursue accused

18

A-26

foreign corporations into their overseas sanctuaries.[4]  That said, why did Congress leave the courts puzzling over something so important and so novel?  If Congress had deemed it necessary and important for the EEA to transcend the existing criminal service of process rules with respect to foreign entities, then it could have made that part of the Act.  As Sinovel China points out, some federal statutes expressly provide for extraterritorial service.  *See, e.g.,* 15 U.S.C. § 22 (providing for service in antitrust cases wherever a corporation may be found).  Under the doctrine of *expressio unius . . ."* should this court infer that Congress did *not* intend the EEA to allow extraterritorial service?  This is not a logical or satisfying conclusion, but no other cairns mark the proper path to follow.

The criminal cases considering the alter ego doctrine with respect to the service of process provide only minimal guidance on the choice of law issue.  Three courts did not discuss the choice of law issue at all and applied a federal alter ego test without explanation.  *See Pangang*, 879 F. Supp. 2d at 1066 (applying test from Ninth Circuit and citing New Jersey law); *Public Warehousing*, 2011 WL 1126333, at *5 (applying Eleventh Circuit test); *Chitron*, 668 F. Supp. 2d at 305 (applying test of unknown origin but citing federal case law).  However, two courts, including one in the Seventh Circuit, expressly addressed the choice of law issue and relied on the general maxim set forth by the Supreme Court that the law of the state of incorporation normally determines issues relating to internal corporate affairs.  *See Kolon*, 926 F. Supp. 2d at 815 (citing in *First National*, 462 U.S. at 621 and *Castellano*, 349 F.3d at 486, and applying New

---

[4]  By coincidence, on May 19, 2014, a grand jury in the Western District of Pennsylvania indicted five Chinese citizens serving in the Chinese military for allegedly engaging in industrial espionage against American companies.  *See United States v. Wang Dong, et al.,* Criminal No. 14-118, W.D. Pa.  Lest Sinovel wonder, this court's decision in this order was reached and drafted before that indictment was returned, uninfluenced by any jingoistic impulse to jump on the bandwagon.

Jersey law); *Alfred L. Wolff*, 2011 WL 4471383, at *5 n.5 (citing in *First National*, 462 U.S. at

621 and *Castellano*, 349 F.3d at 486, and applying Delaware law).  As noted above, federal

courts typically take this approach when applying the alter ego doctrine in personal jurisdiction

cases.

As a final matter, I note that on January 31, 2014, after the completion of the briefing

on the motion to quash, Sinovel China filed a letter alerting the court of a recent decision in

which the U.S. Supreme Court held that a California federal district court could not exercise

personal jurisdiction over a German company based on the actions of its U.S. subsidiary.  *See*

dkt. 64 (citing *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014)).  The government correctly noted

in response that *Daimler* is not directly on point because it involved establishing general personal

jurisdiction in a civil suit and addressed the application of an agency and not an alter ego theory.

Further, the Court failed to "pass judgment on the invocation of an agency theory" in that case,

finding that the Ninth Circuit's "sprawling" test for agency did not pass constitutional muster,

and that even if the subsidiary's contacts in California could be attributed to Daimler, they were

too slim to subject Daimler to general jurisdiction in the state.  *Id.* at 759-60.  In reaching its

decision, however, the Court emphasized the general rule that I am applying in this case:  federal

courts must look to "state law in determining the bounds of their jurisdiction."  *Id.* at 753.

In sum, when applying the alter ego doctrine in this case, there is no good reason to

depart from the general rule that state law (here, Delaware's) governs the analysis.  In any event,

it appears that the Delaware standard used in jurisdictional cases is not that different from the

more relaxed federal standard that the government seeks.

## B.  Applicable Alter Ego Standard

The parties disagree as to how great a burden Delaware puts on the party attempting to pierce the corporate veil.  Sinovel China argues that such a litigant must show either that the subsidiary corporation was created with fraud or unfairness in mind, or that it was used for fraudulent or unfair purposes.  In support, Sinovel China cites *NetJets Aviation, Inc. v. LHC Communications*, LLC, 537 F.3d 168, 176-77 (2d Cir. 2008) (reviewing Delaware cases and finding fraud or unfairness necessary to hold parent liable for subsidiary's debts); *Southeast Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 675 (6th Cir. 2006) (applying Delaware law in liability case and noting that fraud or similar injustice needed to pierce corporate veil); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (although fraud not required, element of injustice or unfairness must be present to hold parent liable); *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (applying fraud-based standard in liability case); *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *7 (Del. Ch. Mar. 4, 2004) (must prove fraud or injustice to hold parent liable; however not requiring this showing when applying alter ego doctrine to establish jurisdiction over parent); *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (applying fraud-based standard in liability case); *Outokumpu Engineering Enterprises, Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Sup. 1996) (applying fraud-based standard in jurisdiction case).[5]

---

[5] In Delaware, the Superior court (Del. Sup.) has jurisdiction over all criminal and civil cases except those related to equity.  It serves as an intermediate appellate court and appeals from this court may be taken to the state supreme court.  The Court of Chancery (Del. Ch.) has jurisdiction to hear all matters relating to equity and is responsible for corporate and commercial matters; appeals from this court may be taken directly to the Supreme Court (Del.).  *See* http://courts.delaware.gov/overview.stm (Visited April 7, 2014).  The Court of Chancery has the equitable power to pierce the corporate veil.  *Medi-Tec*, 2004 WL 415251 at *3.

The government advocates application of a lower standard here, contending that Delaware applies the alter ego doctrine differently in different contexts. Specifically, the government argues that Delaware requires a showing of fraud only where a litigant seeks to hold a parent corporation liable for the acts of its subsidiary, as in all of the cases cited by Sinovel China except for *Outokumpu*. According to the government, recent Delaware opinions have recognized that to exercise personal jurisdiction, the court need only find that the subsidiary is a mere conduit of the parent corporation. *Zhai v. Stein*, 2012 WL 1409358, at *7 (Del. Sup. Jan. 6, 2012) (fraud is an extra element only in liability cases); *Connecticut General Life Ins. Co. v. Pinkas*, 2011 WL 5222796, at *2 (Del. Ch. Oct. 28, 2011) (to establish jurisdiction, it must be shown that the two entities have no real separate identity and that acts were performed in Delaware that can be imputed to out-of-state defendant); *In re American International Group, Inc.*, 965 A.2d 763, 816 n.194 (Del. Ch. 2009) (noting in dicta that veil piercing and other similar theories depend on notion that entity present in Delaware is not separate from person over whom jurisdiction is asserted); *Maloney-Refaie v. Bridge at School, Inc.*, 958 A.2d 871, 880-81 (Del. Ch. 2008) (stating that contacts of forum entity attributable to foreign entity if forum entity merely an alter ego of foreign entity and listing fraud as one of several alternative means of disregarding the corporate form); *HMG/Courtland Properties, Inc. v. Gray*, 729 A.2d 300, 307-08 (Del. Ch. 1999) (must show two entities have no real separate identity and acts exist in Delaware that can be imputed to our-of-state defendant); *Gebelein v. Perma-Dry Waterproofing Co.*, 7 Del. J. Corp. L. 309, 312 (Del. Ch. Jan. 12, 1982) (piercing corporate veil for jurisdictional purposes requires only that corporation has no independent reason for existence and sole purpose is to do "the act and bidding of the individual").

22

The government appears to be correct.  In *Zhai*, the superior court noted that

> Substantively, for jurisdictional purposes, a plaintiff seeking to pierce the corporate veil usually must demonstrate that the corporation has no independent reason for existence and exists solely to provide a means for doing an individual's bidding. An additional burden exists when a Plaintiff is seeking to pierce the corporate veil for liability purposes, as in this case. Such a Plaintiff must generally demonstrate fraud or contravention of law or contract.

2012 WL 1409358 at *7.

The chancery court has provided a similar explanation, noting that "[u]nder the alter ego theory of personal jurisdiction, 'the contacts of an entity with a particular forum can be attributed to another person or entity if the entity having the forum contacts is the mere alter ego of such other person or entity.'" *Maloney-Refaie*, 958 A.2d at 880-81 (Del. Ch. 2008) (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 3–5[c][1]; *Sternberg v. O'Neil*, 550 A.2d 1105, 1126 n. 45 (Del. 1988)).  The court in *Maloney-Refaie* then went on to note that "[i]n addition, a court may disregard the corporate form 'in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of the corporation . . . are involved.'" *Id.* at 881 (citing *Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968); *Medi–Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *3-7 (Del. Ch. Mar. 4, 2004)).  In *Medi-Tec*, 2004 WL 415251, at *3-7, the chancery court applied both versions of the alter ego in the same case, using the fraud-based test for only for the substantive liability analysis.

In sum, although Delaware courts have not sharply delineated the parameters of the alter ego doctrine that they apply when determining jurisdiction, it is sufficiently clear that Delaware

23

A-31

does not require a showing of fraud in order for a litigant to pierce the corporate veil in this context.

## III.  Alter Ego Analysis

Generally, the questions that a court must ask when evaluating an alter-ego argument for veil piercing include:

- Was the corporation was adequately capitalized for the corporate undertaking?

- Was the corporation was solvent?

- Did the corporation observe standard corporate formalities?  For instance, did it pay dividends?  Did it keep corporate records?  Did officers and directors perform function properly?

- Did the dominant shareholder siphon corporate fund?

- In general, did the corporation simply function as a facade for the dominant shareholder?

*Soroof Trading Development Co., Ltd. v. GE Fuel Cell Systems, LLC*, 842 F. Supp. 2d 502, 521 (S.D.N.Y. 2012) (citing *NetJets*, 537 F.3d at 176–77).  No one factor is dispositive, and the fact that the parent corporation and its subsidiary have common directors and officers is not enough by itself to pierce the corporate veil.  *See Bestfoods*, 524 U.S. at 63.  The test is a strict one; "[t]he vast majority of cases addressing the alter ego doctrine in the jurisdictional context have declined to disregard the corporate form."  *Corporate* & *Commercial Practice in DE Court of Chancery* § 3.04[c][1] at 49.  It is concededly a wobbler whether the government has presented sufficient evidence to meet this high standard.

24

A-32

In this case, the government alleges that Sinovel USA relied on Sinovel China for its employees, its funding, its tax preparation and its website. The "office" of Sinovel USA was little more than a closet, and the lease was signed and the rent paid by Sinovel China. Almost everyone who worked at Sinovel USA showed up on temporary assignment from Sinovel China, and Sinovel China paid all of the expenses associated with those employees and Sinovel China supervised these employees. There is no evidence that these temporary employees regularly held themselves out to be employees of Sinovel USA (one employee, however, testified that he did represent himself as connected with Sinovel USA in an email). There is no evidence of what Sinovel USA actually did that was separate or independent from Sinovel China. Zhou was named a Sinovel USA employee but he never lost his ties to Sinovel China. Sinovel USA does appear to have kept its own books and it filed its own tax returns, but Sinovel China assisted with these tasks. Sinovel USA opened two bank accounts in its name; the only two signatories were Han and Li, in China, but Li did not act or release funds without the approval of Han or later Wei, the subsequent president of Sinovel China.

After the FBI visited Sinovel USA's office and spoke to Wei–another Sinovel China employee working there–a Sinovel China supervisor (Zhang), advised Zhou that Sinovel China would not renew its lease of that office. Zhou then notified Zhang that he would resign from Sinovel China, thus severing his formal tie to the parent company. Notwithstanding this claim of resignation, Zhou remained Sinovel China's agent–its "boots on the ground"–in the United States. Zhou continued to maintain possession of the keys to the Houston office, the keys to the Houston apartment and the keys to the corporate vehicle in Houston. (Importantly, Sinovel China's lease on the Houston office continued through July and Zhou still had the keys access

25

to the office at the time the government mailed its summons to the Houston address in June and hand-served its summons on Sinovel USA's registered agent in Dover, Delaware).

Zhang instructed Zhou to take all of the important documents out of the Houston office and bring them to the Sinovel apartment in Houston and to destroy the remaining documents. Zhou transported documents to the Houston apartment as instructed and he used the company car to drive Xue to the airport so that Xue could return to China and continue to work for Sinovel China. By mid-June 2013, Sinovel China —*not* Sinovel USA—signed a service contract with a separate United States entity to fulfill Sinovel's remaining contractual obligations in the United States; Sinovel China even asked its new service contractor to retrieve items left behind in an apartment in the United States, explaining that it could not send its own employees because of the "litigation" in the United States.

Having arrived at this juncture, the court concludes that, when applying Delaware law to these facts, it is sufficiently clear that Sinovel USA had and has no independent reason for existence from Sinovel China. Sinovel USA's sole function was and is to do the acts and bidding of Sinovel China, while giving Sinovel China a jurisdictional firewall against liability and culpability. Sinovel USA was Sinovel China's puppet, so that its presence and acts in the U.S. can be imputed to Sinovel China. As a result, the veil is pierced, the firewall breached, and service of the summons on Sinovel USA, both in Dover and in Houston, constitutes timely and valid service on Sinovel China.

26

A-34

ORDER

IT IS ORDERED that specially appearing defendant Sinovel China's motion to quash,

dkt. 50, is DENIED.

Entered this 27th day of May, 2014.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

27

A-35

**United States Court of Appeals for the Seventh Circuit**

**Appellant's Brief**

**<u>Appendix C</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA

v.

SINOVEL WIND GROUP CO., LTD., dba
SINOVEL WIND GROUP (USA) CO., LTD.,
SU LIYING, ZHAO HAICHUN, and
DEJAN KARABASEVIC aka DAN
KARABASEVIC,

Defendants.

INDICTMENT

Case No. **13 CR 84** BBC

18 U.S.C. § 1343
17 U.S.C. § 506(a)(1)(A)
18 U.S.C. § 2319
18 U.S.C. § 1832
18 U.S.C. § 371

---

THE GRAND JURY CHARGES:

## COUNT 1

At times material to this Count:

1.     AMSC (formerly American Superconductor, Inc.), was a United States-based company with its principal office in Devens, Massachusetts, and other offices in Middleton, Wisconsin; New Berlin, Wisconsin; and Klagenfurt, Austria.  AMSC's core business was the development, support, and production of equipment and software for wind turbines and electrical grids.

2.     Among the products that AMSC developed and sold was software and equipment to regulate the flow of electricity from wind turbines to electrical grids.  Two AMSC products that are part of the AMSC wind turbine electrical control system and that use AMSC proprietary software are the Power Module 3000 (PM3000) and the Programmable Logic Controller (PLC).  These products work together using, among other programs, AMSC's Low Voltage Ride Through (LVRT) software.  The equipment and software that comprise the LVRT system are designed to keep the wind turbine

operational when there is a temporary sag or dip in flow of electricity in the electrical

grid.  AMSC considered the source code, software, equipment designs, technical

drawings, and architecture for the LVRT system to be trade secrets and proprietary

information.  AMSC took reasonable measures to keep its trade secrets and proprietary

information secret.  In addition, AMSC's trade secrets derived independent economic

value from not being generally known to, and not being readily ascertainable through

proper means by, the public.

3.      The software that runs the PM3000 and the PLC were original works of

authorship, belonging to AMSC, that were fixed in a tangible medium of expression

within the AMSC computer system.  The software that runs the PM3000 was developed

in Wisconsin and was stored on a computer in AMSC's Middleton, Wisconsin office, in

the Western District of Wisconsin.  The PM3000 software was derived from AMSC's

PM3000 computer source code and was stored in a development folder in a computer in

AMSC's Middleton, Wisconsin office.  AMSC incorporated the term "copyright" into

the PM3000 source code and took deliberate steps to protect the source code and its

other intellectual property from unauthorized use.  In the same Middleton, Wisconsin

computer server, AMSC stored a proprietary "checksum generator" program

developed to work in conjunction with the PM3000 source code.

4.      AMSC produced the PM3000, the PLC, the source code, and the software

that ran these devices for interstate and foreign commerce.

5.      Among other measures to protect its confidential proprietary information,

AMSC restricted physical access to its work spaces to authorized personnel and

2

required its employees, including DEJAN KARABASEVIC, to create and use a unique password to access the AMSC computer system. Additionally, AMSC required its employees to certify their understanding of AMSC's Code of Business Conduct and Ethics. That code required AMSC employees: to act in the best interests of AMSC; to avoid conflicts of interest; to not disclose confidential business information; to protect AMSC assets; and to not use AMSC assets for personal gain. In addition, AMSC's Information Technology Policy forbade use of the AMSC computer network to violate AMSC standards of ethics or to transmit proprietary information in any manner inconsistent with AMSC policies and directives.

6.     SINOVEL WIND GROUP CO., LTD., dba SINOVEL WIND GROUP (USA) CO., LTD., (SINOVEL), a manufacturer and exporter of wind turbines based in the People's Republic of China (China), with an office in Houston, Texas, purchased software and equipment from AMSC for the wind turbines that SINOVEL manufactured, sold, and serviced. SINOVEL sold and serviced wind turbines in China, the United States, and around the world. SINOVEL legitimately purchased software and equipment from AMSC until March 2011. In March 2011, Sinovel owed AMSC more than $100,000,000 United States Dollars (USD) for software, products, and services previously delivered, and had contracted to purchase more than $700,000,000 USD in software, products, and services from AMSC in the future.

7.     SU LIYING, a Chinese national residing in China and a member of this conspiracy, worked as a Deputy Director in SINOVEL's Research and Development Department.

8.     ZHAO HAICHUN, a Chinese national residing in China and a member of this conspiracy, worked as a Technology Manager for SINOVEL.

9.     DEJAN KARABASEVIC, aka DAN KARABASEVIC, (KARABASEVIC), a Serbian national and a member of this conspiracy, was employed by AMSC Windtec GmbH (AMSC Windtec), in Klagenfurt, Austria.  AMSC Windtec was a wholly-owned subsidiary of AMSC.  KARABASEVIC headed the Automation Engineering Department at AMSC Windtec, in Klagenfurt, Austria.  On March 10, 2011, KARABASEVIC submitted his resignation, which was accepted on March 11, 2011. KARABASEVIC retained access to the AMSC Windtec computer system into May 2011 and his final day with AMSC Windtec was June 30, 2011.

<u>Conspiracy</u>

10.     From on or about January 1, 2011, to on or about December 20, 2012, in the Western District of Wisconsin and elsewhere, the defendants,

SINOVEL, SU LIYING, ZHAO HAICHUN, and
DEJAN KARABASEVIC,

knowingly and unlawfully conspired with each other and with others, known and unknown to the grand jury, to commit and to cause to be committed violations against the United States, namely, trade secret theft, in violation of Title 18, United States Code, Section 1832(a)(2), and criminal copyright infringement, in violation of Title 17, United States Code, Section 506(a)(1)(A) and Title 18, United States Code, Section 2319.

11.     It was the object and purpose of the conspiracy to obtain AMSC's copyrighted information and trade secrets in order to produce LVRT compliant wind turbines, and to retrofit existing wind turbines with LVRT technology, without having

4

to pay AMSC for previously-delivered AMSC software, products, and service or for

AMSC's trade secrets and intellectual property, thereby cheating AMSC out of more

than $800,000,000 USD.

The manner and means by which the conspiracy was sought to be accomplished

included, among others, the following:

12.     It was part of the conspiracy that SINOVEL, through SU LIYING and

ZHAO HAICHUN, recruited KARABASEVIC to leave AMSC Windtec and join

SINOVEL.

13.     It was further part of the conspiracy that, between March 1, 2011, and June

30, 2011, KARABASEVIC secretly copied intellectual property from the AMSC

computer system, including the PM3000 source code.

14.     It was further part of this conspiracy that on or about June 1, 2011,

SINOVEL provided KARABASEVIC with a one-year employment contract that made it

appear that KARABASEVIC would work for a Chinese wind turbine blade

manufacturer from July 1, 2011, to June 30, 2012, in order to hide the fact that

KARABASEVIC planned to work for SINOVEL during the same period.

15.     It was further part of this conspiracy that between approximately May 1,

2011, and June 30, 2011, SINOVEL provided KARABASEVIC with a laptop computer to

be used to adapt AMSC's intellectual property for SINOVEL's unrestricted use.

16.     It was further part of this conspiracy that between approximately May 1,

2011, and June 30, 2011, KARABASEVIC provided SINOVEL with AMSC proprietary

software, technical information, and trade secret information, relating to the PM3000

and the PLC, including a modified version of the software compiled from the PM3000 source code.

17.     It was further part of this conspiracy that, during June 2011, SINOVEL provided KARABASEVIC with an apartment in Beijing, China, and equipment for his use to deploy AMSC's intellectual property for unlimited and unlicensed use by SINOVEL.

18.     It was further part of this conspiracy that between on or about March 7, 2011, and on or about June 24, 2011, KARABASEVIC adapted the AMSC intellectual property that he had unlawfully downloaded for unlicensed use within SINOVEL's wind turbines.

19.     It was further part of this conspiracy that on or about June 11, 2011, KARABASEVIC emailed SU LIYING a modified version of the software compiled from AMSC's PM3000 source code.

20.     It was further part of this conspiracy that between June 11, 2011, and December 11, 2011, SU LIYING and ZHAO HAICHUN copied and caused to be copied the software, modified by KARABASEVIC, that was compiled from AMSC's PM3000 source code, and other intellectual property belonging to AMSC, into more than ten Sinovel wind turbines.

21.     It was further part of this conspiracy that on or about October 25, 2011, SINOVEL, with ZHAO HAICHUN serving in a managerial role, commissioned a wind turbine in Charlestown, Massachusetts.  In connection with the commissioning process,

SINOVEL copied into the turbine, software compiled from the stolen and modified

AMSC PM3000 source code.

22.     It was further part of this conspiracy that on or about April 20, 2012,

SINOVEL, with ZHAO HAICHUN serving in a managerial role, commissioned a wind

turbine in Scituate, Massachusetts.  In connection with the commissioning process,

SINOVEL copied into the turbine, software compiled from the stolen and modified

AMSC PM3000 source code.

23.     It was further part of this conspiracy that on or about May 22, 2012,

SINOVEL, with ZHAO HAICHUN serving in a managerial role, commissioned two

wind turbines in Fairhaven, Massachusetts.  In connection with the commissioning

process, SINOVEL copied into the turbines, software compiled from the stolen and

modified AMSC PM3000 source code.

24.     In furtherance of this conspiracy, and to accomplish its objectives,

SINOVEL, SU LIYING, ZHAO HAICHUN, and DEJAN KARABESEVIC performed and

caused to be performed the following acts, among others, within the Western District of

Wisconsin and elsewhere:

(a)     On or about February 26, 2011, ZHAO HAICHUN emailed

KARABASEVIC a contract offering a salary of 11 million renminbi (approximately $1.7

million USD) for KARABASEVIC to work for SINOVEL from May 2011 through June

2017, essentially doubling KARABASEVIC's annual pay.

(b)     On or about March 7, 2011, KARABASEVIC used the internet to

7

access an AMSC computer in Middleton, Wisconsin to secretly copy the development folder for the PM3000, which included the PM3000 source code.

(c)     On or about March 21, 2011, KARABASEVIC noted in a written Skype "chat" to ZHAO HAICHUN that SINOVEL had the "full code" for AMSC's PLC device.

(d)     On or about May 9, 2011, KARABASEVIC, in a written Skype "chat," confirmed to SU LIYING that he had provided to SINOVEL, through her, "the latest PM3000" software.

(e)     On or about May 10, 2011, SU LIYING, in a written Skype "chat," indicated to KARABASEVIC that she was under pressure from her SINOVEL supervisors to successfully adapt AMSC's LVRT technology for SINOVEL. KARABASEVIC responded, "if you succeed, Sinovel can separate from AMSC." SU LIYING replied "and I need your strong help. haha."

(f)     On about May 10, 2011, SU LIYING emailed KARABASEVIC information concerning errors occurring in a turbine test she ran while attempting to adapt AMSC's LVRT software for SINOVEL turbines.

(g)     On or about May 21, 2011, KARABASEVIC emailed "the latest software" to SU LIYING with directions for its use.  The software KARABASEVIC sent was trade secret information and intellectual property belonging to AMSC.

(h)     On or about May 26, 2011, KARABASEVIC traveled to China to adapt AMSC's proprietary and trade secret information for use in SINOVEL wind turbines.

8

(i)     On or about May 28, 2011, KARABASEVIC emailed SU LIYING a modified version of software compiled from AMSC's PM3000 source code.

(j)     On or about May 2, 2011, and on or about June 1, 2011, SINOVEL provided KARABASEVIC with employment contracts that made it appear that KARABASEVIC would work for a different business, a Chinese wind turbine blade manufacturer, from May 3, 2011, to June 30, 2012.

(k)     On or about June 2, 2011, ZHAO HAICHUN, in a written Skype "chat," reported to KARABASEVIC that he was at a wind turbine farm in Gansu, China, and had conducted a "voltage sag" test on twenty-one SINOVEL wind turbines to which the LVRT update had been copied.  ZHAO HAICHUN noted that the test was successful and wrote to KARABASEVIC that it was "all because of you."

(l)     On or about June 11, 2011, KARABASEVIC emailed SU LIYING a modified version of the software compiled from AMSC's PM3000 source code.

(m)     On or about October 25, 2011, SINOVEL and ZHAO HAICHUN copied and caused to be copied the software compiled from the stolen and modified AMSC PM3000 source code into a wind turbine in Charlestown, Massachusetts.

(n)     On or about April 20, 2012, SINOVEL and ZHAO HAICHUN copied and caused to be copied the software compiled from the stolen and modified AMSC PM3000 source code into a wind turbine in Scituate, Massachusetts.

(o)     On or about May 22, 2012, SINOVEL and ZHAO HAICHUN copied and caused to be copied the software compiled from the stolen and modified AMSC PM3000 source code into two wind turbines in Fairhaven, Massachusetts.

9

(All in violation of Title 18, United States Code, Section 371).

## COUNT 2

1.      Paragraphs 1 through 24 of Count One are incorporated here.

2.      On or about March 7, 2011, in the Western District of Wisconsin and elsewhere, the defendants,

<div style="text-align:center">

SINOVEL, SU LIYING, ZHAO HAICHUN, and
DEJAN KARABASEVIC,

</div>

with the intent to convert a trade secret, specifically, the PM3000 source code, that is related to a product that is used and intended for use in interstate and foreign commerce, to the economic benefit of anyone other than the trade secret's owner, namely, SINOVEL, and knowing and intending that the offense would injure AMSC, the trade secret owner, knowingly and without authorization copied, duplicated, downloaded, and conveyed such information.

(In violation of Title 18, United States Code, Sections 1832(a)(2) and 2).

## COUNT 3

1.      Paragraphs 1 through 24 of Count One are incorporated here.

2.      On or about March 7, 2011, in the Western District of Wisconsin and elsewhere, the defendants,

<div style="text-align:center">

SINOVEL, SU LIYING, ZHAO HAICHUN, and
DEJAN KARABASEVIC,

</div>

having knowingly devised and intending to devise a scheme to defraud AMSC of its intellectual property, namely, the source code for the PM3000 and proprietary and other confidential business information relating to the PM3000, by means of materially false

<div style="text-align:center">

10

A-46

</div>

statements and by concealment of material facts for the purpose of executing and

attempting to execute the scheme to defraud, knowingly transmitted and caused to be

transmitted by means of wire communications in interstate and foreign commerce,

writings, signals, and pictures by downloading the PM3000 source code and other

proprietary and confidential business information relating to the PM3000 from an

AMSC computer in Middleton, Wisconsin to a computer in Austria.

(In violation of Title 18, United States Code, Sections 1343 and 2).

A TRUE BILL

_____
PRESIDING JUROR

_____
JOHN W. VAUDREUIL
United States Attorney

Indictment returned: 6/27/2013

11

A-47

**United States Court of Appeals for the Seventh Circuit**

**Appellant's Brief**

**<u>Appendix D</u>**

**Rule 4. Arrest Warrant or Summons on a Complaint**

(a) **Issuance.** If the complaint or one or more affidavits filed with the complaint establish probable cause to believe that an offense has been committed and that the defendant committed it, the judge must issue an arrest warrant to an officer authorized to execute it. At the request of an attorney for the government, the judge must issue a summons, instead of a warrant, to a person authorized to serve it. A judge may issue more than one warrant or summons on the same complaint. If a defendant fails to appear in response to a summons, a judge may, and upon request of an attorney for the government must, issue a warrant.

(b) **Form.**

(1) *Warrant.* A warrant must:

(A) contain the defendant's name or, if it is unknown, a name or description by which the defendant can be identified with reasonable certainty;

(B) describe the offense charged in the complaint;

(C) command that the defendant be arrested and brought without unnecessary delay before a magistrate judge or, if none is reasonably available, before a state or local judicial officer; and

(D) be signed by a judge.

(2) *Summons.* A summons must be in the same form as a warrant except that it must require the defendant to appear before a magistrate judge at a stated time and place.

(c) **Execution or Service, and Return.**

(1) *By Whom.* Only a marshal or other authorized officer may execute a warrant. Any person authorized to serve a summons in a federal civil action may serve a summons.

(2) *Location.* A warrant may be executed, or a summons served, within the jurisdiction of the United States or anywhere else a federal statute authorizes an arrest.

(3) *Manner.*

(A) A warrant is executed by arresting the defendant. Upon arrest, an officer possessing the original or a duplicate original warrant must show it to the defendant. If the officer does not possess the warrant, the officer must inform the defendant of the warrant's existence and of the offense charged and, at the defendant's request, must show the original or a duplicate original warrant to the defendant as soon as possible.

(B) A summons is served on an individual defendant:

(i) by delivering a copy to the defendant personally; or

(ii) by leaving a copy at the defendant's residence or usual place of abode with a person of suitable age and discretion residing at that location and by mailing a copy to the defendant's last known address.

(C) A summons is served on an organization by delivering a copy to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process. A copy must also be mailed to the organization's last known address within the district or to its principal place of business elsewhere in the United States.

**(4)** *Return.*

(A) After executing a warrant, the officer must return it to the judge before whom the defendant is brought in accordance with Rule 5. The officer may do so by reliable electronic means. At the request of an attorney for the government, an unexecuted warrant must be brought back to and canceled by a magistrate judge or, if none is reasonably available, by a state or local judicial officer.

(B) The person to whom a summons was delivered for service must return it on or before the return day.

(C) At the request of an attorney for the government, a judge may deliver an unexecuted warrant, an unserved summons, or a copy of the warrant or summons to the marshal or other authorized person for execution or service.

**(d) Warrant by Telephone or Other Reliable Electronic Means.** In accordance with Rule 4.1, a magistrate judge may issue a warrant or summons based on information communicated by telephone or other reliable electronic means.

(As amended Feb. 28, 1966, eff. July 1, 1966; Apr. 24, 1972, eff. Oct. 1, 1972; Apr. 22, 1974, eff. Dec. 1, 1975; Pub. L. 94–64, §3(1)–(3), July 31, 1975, 89 Stat. 370, eff. Dec. 1, 1975; Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 26, 2011, eff. Dec. 1, 2011.)

## Rule 4.1. Complaint, Warrant, or Summons by Telephone or Other Reliable Electronic Means

**(a) In General.** A magistrate judge may consider information communicated by telephone or other reliable electronic means when reviewing a complaint or deciding whether to issue a warrant or summons.

**(b) Procedures.** If a magistrate judge decides to proceed under this rule, the following procedures apply:

**(1)** *Taking Testimony Under Oath.* The judge must place under oath—and may examine—the applicant and any person on whose testimony the application is based.

**(2)** *Creating a Record of the Testimony and Exhibits.*

(A) *Testimony Limited to Attestation.* If the applicant does no more than attest to the contents of a written affidavit submitted by reliable electronic means, the judge must acknowledge the attestation in writing on the affidavit.

(B) *Additional Testimony or Exhibits.* If the judge considers additional testimony or exhibits, the judge must:

(i) have the testimony recorded verbatim by an electronic recording device, by a court reporter, or in writing;

(ii) have any recording or reporter's notes transcribed, have the transcription certified as accurate, and file it;

(iii) sign any other written record, certify its accuracy, and file it; and

(iv) make sure that the exhibits are filed.

**(3)** *Preparing a Proposed Duplicate Original of a Complaint, Warrant, or Summons.* The applicant must prepare a proposed